[Cite as *In re A.S.*, 2019-Ohio-4127.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| IN RE: | : | CASE NOS. CA2019-05-071 |
| | | CA2019-05-072 |
| A.S., et al. | : | CA2019-05-073 |
| | : | O P I N I O N |
| | | 10/7/2019 |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. JN2016-0021 & JN2016-0022

Michael T. Gmoser, Butler County Prosecuting Attorney, Michael Greer, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee

Temin Law Office, LLC, Andrew M. Temin, 246 High Street, Hamilton, Ohio 45011, for appellant, father

Jeannine C. Barbeau, P.O. Box 42324, Cincinnati, Ohio 45242, for appellant, mother

Carol Garner, 9435 Waterstone Blvd., Suite 140, Cincinnati, Ohio 45249, attorney for child, A.S.

**M. POWELL, J.**

{¶ 1} Appellants, the mother and father of A.S. and Y.S. (respectively, "Mother" and "Father"), appeal the decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of their two daughters to appellee, Butler County

Children Services ("BCCS"). For the reasons discussed below, this court affirms the decision of the juvenile court.

**The Parties**

{¶ 2} The children at issue are A.S., born August 18, 2010, and Y.S., born April 14, 2009. Mother has three other children, A.H., S.M., and R.V., who are not subjects of this appeal. According to the record, Father is not the biological father of A.H., S.M., or R.V. and Mother no longer has custody of these children. Specifically, the record reflects A.H. was placed with a non-relative in April 2013. In May 2016, Mother consented to the juvenile court awarding legal custody of A.H. to the nonrelative as in his best interest. The juvenile court also removed S.M. and R.V from Mother's care in January 2016 and placed them in a licensed foster home based upon admitted allegations of dependency and abuse. R.V. was temporarily returned to Mother's care in October 2017, but was removed a second time in June 2018. The record indicates Mother permanently surrendered her parental rights to S.M. and R.V. in October 2018.

{¶ 3} The family has an extensive history with BCCS, which began in 2009. This includes allegations of domestic violence between Mother, Father, and various maternal relatives; physical abuse reports involving R.V. and S.M.; and an investigation of possible sexual abuse of Y.S. In 2012, the children were removed from Mother's care and placed in foster care for approximately six months. The removal was based, at least in part, on concerns regarding domestic violence between Mother and Father, inappropriate child care, bed bugs in the home, hygiene concerns, and a lack of food for the children. S.M., R.V., A.S., and Y.S. ultimately reunified with Mother.

**Facts and Procedural History**

{¶ 4} On January 19, 2016, BCCS filed two complaints requesting that A.S and Y.S. be placed in the temporary custody of BCCS. In support of its complaints, BCCS alleged

both children were neglected and dependent children, and further alleged that Y.S. was an abused child. These allegations arose after BCCS received information that Y.S. had a bruise on her cheek and that her brother's face was swollen, and his lips were bloody and bruised. A subsequent investigation revealed that Mother had hit Y.S.'s face with a broom and punched her brother in the mouth with a closed fist. During the investigation, BCCS also discovered a significant lice infestation in Y.S.'s hair. It was further reported that Mother would leave the children unattended for several hours overnight while she went "clubbing." As a result, Mother was arrested for domestic violence and the children were placed in a licensed foster home.

{¶ 5} Upon the filing of BCCS's complaints, the juvenile court granted BCCS's motions for emergency temporary custody of A.S., Y.S., and their three older brothers. As a result, A.S. and Y.S. remained in the foster home and the juvenile court appointed them with a guardian ad litem. It is undisputed that since being removed from Mother's care, A.S., Y.S., S.M., and R.V. have remained in the same foster home with the same foster family, including the time they were removed from Mother's care in 2012. The record indicates the children are doing well in their foster home and are bonded to their foster mother. Additionally, the children's foster mother expressed a willingness to adopt all four children, should they become eligible for adoption.

{¶ 6} In March 2016, the juvenile court held a pretrial hearing, which Father attended with an interpreter. At the hearing, Father indicated he and Mother were married but separated, and that he only recently learned of the children's removal from Mother's care.

{¶ 7} In May 2016, the juvenile court conducted an adjudicatory hearing before a magistrate upon BCCS's complaints. At the hearing, BCCS agreed to withdraw its allegations of neglect, and proceed upon the allegations of abuse and dependency for Y.S.,

and dependency for A.S. Mother and Father agreed that Y.S. and A.S. were dependent children and that Y.S. was an abused child. The parents also agreed that Mother was the perpetrator of the abuse against Y.S. Based upon the parents' stipulations, the juvenile court adjudicated Y.S. a dependent and abused child and A.S. a dependent child. In a subsequent written entry, the magistrate ordered BCCS to prepare a case plan for Mother and Father, and that Mother's and Father's contact and visitation with the children should be liberalized by agreement of the children's guardian ad litem and their caseworker. The magistrate further ordered the guardian ad litem and BCCS to establish appropriate visitation for Father.

{¶ 8} Thereafter, a case plan was established indicating Mother's and Father's desire to reunify with A.S. and Y.S. and identifying reunification as the children's permanency goal. The case plan required Mother to address her parenting practices and refrain from using physical discipline with the children, which included: completing a parenting education program and complying with any resulting recommendations; participating in family counseling; and demonstrating her ability to provide for the family. The case plan further noted Mother's history of illegal substance use and mental health issues. In light of this history, the case plan required Mother submit to random drug screens and complete a substance abuse/mental illness ("SAMI") assessment and comply with recommendations arising from the assessment.

{¶ 9} Regarding Father, the case plan noted his history of cocaine abuse, lack of stability, and inconsistent contact with A.S. and Y.S. As a result, Father was also required to complete a SAMI assessment and comply with recommendations; engage in therapeutic visitation with the children; maintain stable housing and financial stability for the children; and submit to random drug screens.

{¶ 10} On July 19, 2016 a dispositional hearing was held before a magistrate. After

- 4 -

the hearing, the magistrate issued a decision which indicated it was in the children's best interests to remain in the temporary custody of BCCS. The magistrate also adopted the May 2016 case plan as an order of the juvenile court and ordered Mother and Father to comply with the case plan.

{¶ 11} In August 2016, the children's guardian ad litem filed a notice and motion for parenting counseling and intensive supervision. In her motion, the guardian ad litem indicated that visits between the children and Father should be restricted, supervised visits, as Father had physically disciplined and harmed the children in the past and had not been a consistent parent for the children or part of their support system. The guardian ad litem further believed Father required "intensive parenting instruction, especially regarding discipline, prior to supervised visits taking place." She then noted a language interpreter would be necessary to assist in conversation during visits.

{¶ 12} In March 2017, a review hearing was held before the magistrate. The record indicates that Mother had been actively participating in case plan services, and regularly visiting the children. Specifically, Mother had been successfully discharged from mental health services, was scheduled to be successfully discharged from the in-home parenting program ("DLS"), and had maintained employment and housing during the pendency of the case. The record further indicates that Father had also been participating in his case plan services, including successfully completing substance abuse treatment, consistently testing negative for all substances, successfully completing DLS, and engaging in weekly therapy sessions with Y.S. and A.S. Father was later discharged from weekly family therapy sessions due to good progress. However, despite Father's progress in certain case plan services, he did not engage in a required domestic violence assessment due to his denial of any past incidents of domestic violence and he struggled in obtaining housing due to his immigration status. As a result of their progress, Mother's and Father's visitation with the

children was liberalized to include unsupervised visitation for both parents, and overnight visitation for Mother.

{¶ 13} In August 2017 BCCS moved the juvenile court to return Father's visits to supervised by BCCS or its designee. In an affidavit in support of the agency's motion, the children's caseworker asserted that after Father completed his substance abuse treatment and after-care sessions, Father tested positive for cocaine in July, 2017 and August, 2017. As such, BCCS requested Father's visitation with A.S. and Y.S. return to being supervised. After a hearing, the magistrate issued an order indicating Father's visitation was to be supervised and Father was referred to complete an updated substance abuse assessment. Thereafter, Father tested positive for cocaine in September 2017 and failed to take a court ordered drug screen in November 2017. The record indicates that shortly thereafter, on November 30, 2017, Father was arrested for driving without a license. According to Father, the judge "decided she wanted to put [him] in jail," although "[n]ormally [he would] just pay a fine." He was held at the Butler County jail until February 2018 for immigration purposes. After his release from jail, Father tested positive for cocaine on April 12, 2018, May 16, 2018, and September 13, 2018.

{¶ 14} On January 5, 2018, a review hearing was held before the magistrate. After the hearing, the magistrate indicated that Mother had completed a number of her case plan services, and therefore, it was in the best interest of A.S. and Y.S. to terminate the agency's temporary custody and place the children in the temporary custody of Mother subject to protective supervision by BCCS. The magistrate further ordered that Mother was to supervise all contact between the children and Father.

{¶ 15} A.S. and Y.S. remained in the temporary custody of Mother for approximately six months. During that time, BCCS had continued concerns regarding the children's placement with Mother, including inappropriate babysitters supervising the children,

violations of the juvenile court's orders, Mother's failure to tend to the children's medical needs, the children's exposure to "random men," and Mother's unaddressed mental health concerns. As a result of the agency's concerns, on June 27, 2018, BCCS filed an emergency motion to remove A.S. and Y.S from Mother's custody and grant temporary custody to BCCS. After a hearing before the magistrate, the magistrate granted BCCS's motion, terminated Mother's temporary custody of the children, and granted temporary custody to BCCS.

{¶ 16} On June 28, 2018, BCCS moved for permanent custody of A.S. and Y.S. In support of its motion, BCCS alleged that no further treatment plan could be formulated for Mother or Father, and that it did not appear that Mother or Father could ever provide adequate parental care for the children. BCCS also alleged that, despite reasonable efforts to reunify the children with Mother and Father, the children could not be placed with Mother or Father within a reasonable time nor should the children be placed with Mother or Father. Concluding, BCCS alleged that there was a reasonable possibility that the children would be adopted if permanent custody was granted and that the children required the permanency that an adoptive placement would provide.

{¶ 17} The juvenile court held a four-day hearing on BCCS's motions for permanent custody. As part of this hearing, the juvenile court heard testimony from Mother and Father, the children's foster mother, Father's chemical dependency counselor, Mother's family services coordinator, the children's caseworker from BCCS, Father's mental health therapist, and Mother's family services supervisor. Following this hearing, the juvenile court issued a decision granting BCCS's motions for permanent custody. In so holding, the juvenile court determined that A.S. and Y.S. had been in the temporary custody of the agency for approximately 21 months prior to the filing of the permanent custody motion. The juvenile court also found that when considering the testimony, as well as the report and

- 7 -

recommendation submitted by the guardian ad litem, BCCS had proved by clear and convincing evidence that a grant of permanent custody was in the children's best interests.

**The Appeal**

{¶ 18} Mother and Father now appeal the juvenile court's decision, collectively raising three assignments of error for review. In their three assignments of error, Mother and Father both argue the juvenile court's decision to grant BCCS's motions for permanent custody was not in the best interests of the children and was against the manifest weight of the evidence.

Permanent Custody Standard of Review

{¶ 19} Before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented. *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10. However, even if the juvenile court's decision is supported by sufficient evidence, "an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶ 20} As with all challenges to the manifest weight of the evidence, in determining whether a juvenile court's decision is against the manifest weight of the evidence in a

permanent custody case, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, *quoting Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases. *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25. Therefore, "[i]f the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Eastley* at ¶ 21.

Two-Part Permanent Custody Test

{¶ 21} Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has

- 9 -

been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

### Analysis

{¶ 22} As it relates to the second part of the two-part permanent custody test, the juvenile court found A.S. and Y.S. had been in the temporary custody of BCCS for more than 12 months of a consecutive 22-month period as of the date BCCS moved for permanent custody. Mother and Father do not dispute this finding. Rather, Mother and Father dispute that granting permanent custody of the children to the agency was in A.S.'s and Y.S.'s best interests. We find no merit to either Mother's or Father's claims.

{¶ 23} When considering the best interest of a child in a permanent custody hearing, the juvenile court is required under R.C. 2151.414(D)(1) to consider all relevant factors, including, but not limited to (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-town providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secured permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child.

{¶ 24} Initially, with respect to the children's relevant interactions and relationships with those who may significantly impact their young lives, the juvenile court discussed the children's relationships with Mother, Father, their foster mother, and their siblings. It found

that Mother had attended visits with the children on a regular basis, which were gradually liberalized until they reunified into Mother's home in January 2018 for six months. The juvenile court further found that Mother is bonded with the children.

{¶ 25} With regard to the children's relationships with Father, the juvenile court found that Father did not have substantial involvement with the children for three years prior to their removal from Mother's care in January 2016. In June 2016, Father began visiting with the children, and engaged with them primarily through an interpreter who was present. The juvenile court noted that neither A.S. nor Y.S. speak or understand Spanish, and both children reported difficulties with Father's inability to speak English. According to the juvenile court, Y.S. indicated the language barrier "makes it hard for her to feel close to [Father]." The juvenile court further found that the evidence presented at the hearing varied as to the quality of bonding between Father and the children. Specifically, the children's foster mother testified that when she supervised visits between the children and Father, Father would "[sit] on his telephone for half of the visit without really engaging with the [children]." Conversely, the children's caseworker testified that the children are bonded with Father.

{¶ 26} Continuing with this factor, the juvenile court further found that the children reported a desire to be placed with S.M. and R.V. in the foster home and wished to be adopted by their foster family. The juvenile court indicated that the foster family had expressed a willingness to adopt all four children, if they were available for adoption.

{¶ 27} Next, regarding A.S.'s and Y.S.'s wishes, the juvenile court relied on the guardian ad litem's report and recommendation that permanent custody of the children should be granted to BCCS. In her report, the guardian ad litem noted that the children have consistently stated they wished to remain in their foster home, and that they want to be with their siblings. She further indicated the children "are very outspoken in their desire

for permanency," and they do not want to worry about the care they will receive from their parents.

{¶ 28} Moreover, with regard to A.S.'s and Y.S.'s custodial histories, the juvenile court found that throughout the case, the children had been placed in the temporary custody of the agency twice and were also placed in the temporary custody of Mother. In total, the juvenile court indicated that the children had been in the temporary custody of the agency for 21 months prior to the filing of the permanent custody motion, and approximately 25 months by the time the permanent custody hearing began.

{¶ 29} Furthermore, when considering the children's need for a legally secure placement, the juvenile court found that despite Mother's and Father's participation in case plan services, "the same concerns that caused [these children] to be removed not only in this case, but in a prior case, have remained." With regard to Mother, the juvenile court found that although she completed mental health services, a domestic violence assessment, family therapy sessions, and parenting education services, Mother remained unable to ensure that the children's needs were met when they were reunified with Mother in January 2018. The juvenile court explained that when the children were placed in her temporary custody in January 2018, Mother failed to ensure that the children were timely scheduled for medical and dental appointments and was "extremely slow" in addressing Y.S.'s mental health concerns. The juvenile court also found that Mother was unwilling to address her own mental health concerns, despite admitting to feeling depressed. Lastly, the juvenile court noted that supervision of the children remained a significant safety concern at the time of the second removal. This included Mother's general lack of supervision of the children and her failure to ensure that appropriate caregivers were entrusted to care for the children.

{¶ 30} Regarding Father, the juvenile court found that Father participated in case

plan services, but there were remaining concerns regarding his cocaine abuse, history of domestic violence, history of unstable housing, his failure to follow the juvenile court's orders, and issues relating to his immigration status and prior incarceration. As such, the juvenile court found that despite services, some concerns related to Father had not been remedied.

{¶ 31} The juvenile court then reiterated that Y.S. and A.S. are doing well and are well adjusted in their foster home. The children were described as bonded to their foster mother, as well as bonded to their brothers who are also in that home. The juvenile court addressed Mother and Father's concern that Y.S. reported being afraid of her foster mother but found that Y.S. had not reported any fear to the agency or the guardian ad litem.

{¶ 32} Based on the foregoing, the juvenile court concluded that "after almost three years since the original removal, the parties have failed to rectify the concerns that led to the [children's] removal, and that the [children's] need for a legally secure permanent placement cannot be obtained without a grant of permanent custody to the agency."

{¶ 33} Finally, with respect to any of the factors contained in R.C. 2151.414(E)(7) to (11), the juvenile court found that none of the factors apply to Mother or Father.

{¶ 34} Based on these findings, the juvenile court found by clear and convincing evidence that it was in A.S.'s and Y.S.'s best interests to grant permanent custody to BCCS. After a thorough review of the record, we find that the juvenile court's determination regarding the children's best interests is supported by sufficient credible evidence.

{¶ 35} Mother argues that although she struggled during the case, an award of permanent custody to the agency was improper because "she has maintained contact with the children and has sought to change her life for herself and for her children." She further contends that she has successfully completed case plan services and wishes for the children to be placed back in her care because she loves her children and can meet their

basic needs.

{¶ 36} At the permanent custody hearing, the children's caseworker testified as to Mother's participation in her case plan services. She testified that Mother completed several aspects of her case plan and "did work on" her mental health. However, despite Mother's initial progress, and continued assistance from the agency, she was unable to maintain the children in her home when they were placed in her temporary custody in January 2018.

{¶ 37} The record indicates that after the children were reunified with Mother, Mother struggled to ensure proper child care for the children. Specifically, Mother would go "clubbing" in the evenings, leaving the children at home until she returned in the early morning hours. Mother testified she frequently called to check on the children and ensured that they were always supervised by a babysitter; however, after the police conducted a well-child check at Mother's home around 1:00 a.m., it was discovered that R.V. was home alone while Mother was "clubbing." Furthermore, when the children were supervised by a babysitter, the record reflects that Mother's choices in babysitters were questionable. Specifically, Mother's babysitters included a friend Mother would go clubbing with; a 14-year-old who would smoke and engage in sexual activity with her boyfriend while the children were present; and a female who lived with Mother and stole food and the children's belongings from the home. According to Mother, she continued using the female as a babysitter despite Mother's concerns about stealing. Mother also allowed Y.S. and A.S. to spend an overnight with Father notwithstanding the juvenile court's order that Father's visitation was to be supervised and evidence that Mother feared having Father in the home with her children due to his history of domestic violence. Mother's inability to ensure proper child care is further established by her testimony that the children could safely be around her mother and brother, who BCCS indicated should have no unsupervised contact with the

children.

{¶ 38} The record further reflects that Mother failed to meet A.S.'s and Y.S.'s medical and mental health needs while in her care. Specifically, the children had head lice each time they were removed from Mother's care, which had developed into chronic lice in June 2018, despite BCCS providing Mother with the products to alleviate the issue. Y.S. also suffered from ringworm, which Mother left untreated, and had 11 teeth extracted in 2016 from significant bottle rot. When the children were reunified with Mother in 2018, Mother failed to attend any medical appointments for the children, or occupational therapy for Y.S., even after the agency directed her to do so. Moreover, Mother neglected Y.S.'s mental health issues, which went untreated for several months while in Mother's care. Mother also declined to address her own mental health concerns, despite her diagnosis of "Adjustment Disorder with mixed anxiety and depressed mood" and admitting to feeling increased anxiety and depression after reunifying with the children in January 2018.

{¶ 39} Furthermore, while the record reflects that Mother maintained housing throughout the case, there were significant concerns regarding the cleanliness and adequacy of her home. Specifically, the caseworker testified that at different times, Mother had various dogs and cats. During visits, the caseworker observed "multiple piles of urine [and] feces from the puppy" on the floors including R.V.'s bedroom, in addition to overflowing litter boxes, and a general smell of cat urine and feces in the home. The caseworker further testified that at one point, the children's rooms were cluttered with toys and clothes, A.S. and Y.S. did not have any linens on their beds, one of their mattresses was covered in paint, and that there were reports of bed bugs in the home. The caseworker also noted a cockroach infestation in the home, which frightened Y.S. to the point that she would hold her urine during visits.

{¶ 40} Ultimately, the caseworker explained at the hearing that even "with all the

case plan services, [and] all of the support, [Mother] was not able to maintain [the children] in her home. She had a year of DLS parenting classes. She had a year of very intensive [agency] involvement and there were still ongoing issues of lice, supervision issues with the children, truancy issues with [R.V., and] a lack of follow through with medical appointments and mental health appointments." The record indicates that many of these same issues were present when the children were removed from Mother's care in 2012, and again in 2016. Notably, the children's removal in 2012 was based, in part, on the conditions of Mother's residence and the supervision of the younger children. Thus, despite the multiple forms of services provided by the agency, and several years of opportunities provided to Mother, we find there is sufficient credible evidence in the record that Mother has failed to consistently address BCCS's lingering concerns.

{¶ 41} Similarly, Father also argues the juvenile court erred in finding that granting permanent custody to BCCS was in the best interests of the children. First, Father claims the evidence presented at the hearing established that he had a suitable and stable home for the children and an income adequate to support them. However, the record indicates that Father maintained inconsistent and inappropriate housing for the children throughout much of the case. Specifically, Father was living with a friend in 2016 when BCCS filed its complaints. BCCS could not determine whether that home was suitable for the children because the friend would not let a BCCS caseworker inside to inspect the home. Afterward, Father moved in with a different friend in a nearby trailer park. He resided with the second friend for a short time, however, the friend was deported shortly after Father moved in. According to Father, he was not comfortable having BCCS in that home as it did not belong to him, and BCCS was unable to visit the home. In June 2018, the same month BCCS filed its motions for permanent custody, Father moved to a three-bedroom house, which the caseworker testified she visited on two occasions. Thus, although Father ultimately found

housing that may have been suitable for the children, he did so after spending over two years of the case living in various housing arrangements which were inadequate for the children.

{¶ 42} We also reject Father's argument that he was not afforded an opportunity to demonstrate that he can provide for the children and provide an appropriate home for them. The record indicates that Father and Mother were married in 2009 and were residing with the maternal grandmother at that time. The home was described as a two-bedroom house, where five children and three adults were living. Father's testimony revealed that several domestic disputes occurred in the home, including disputes which turned physical and occurred in front of the children. The record also reflects that Father was aware that there were concerns related to the cleanliness of the home, namely, that bed bugs were present and that A.S. and Y.S. had lice in their hair. Father was also aware that Y.S.'s teeth were "not looking bright," but never took Y.S. or A.S. to the dentist or otherwise addressed his concerns with the home. Father indicated he encouraged Mother to move to another home prior to the children's removal in 2012, however, Mother did not want to leave, and Father did not remove the children.

{¶ 43} Father moved out of the home in 2013 and would visit the children "sometimes on the weekends." Between 2013 and 2016 Father estimated he saw the children for two to three hours a visit and indicated he had not lived with the children regularly since 2013. With regard to the 2016 removal, Father stated he was not initially aware of the case because Mother was not allowing him to see the children at that time. Father also testified that although he had many concerns regarding Mother's care for the children, he did not take steps to ensure they were attending their dental, medical, or mental health appointments. According to Father, because Mother "was the one that had * * * charge of the kids then[,] she was the one in charge of all that." The record further reflects that Father

- 17 -

was unaware the children were not up to date with their medical appointments when they were removed from Mother's custody in 2016. Father was also unsure what Y.S.'s mental health diagnoses were and did not attempt to enroll her in any mental health therapy in accordance with the case plan.

{¶ 44} In light of the above, we find that although BCCS's 2016 complaints were primarily based upon acts of domestic violence by Mother, Father's actions and inactions throughout the children's lives support the juvenile court's determination that granting permanent custody to BCCS was in the best interests of A.S. and Y.S. Specifically, the record shows that Father left the children in the maternal grandmother's home in 2013, despite knowledge that the home was riddled with domestic violence and was damaging for the children's health and safety. Moreover, Father was aware that Mother was neglecting A.S.'s and Y.S.'s mental and physical needs and was leaving the children with improper supervision, but made no effort to ensure the children were being properly cared for. Notably, as the juvenile court found, "Father was so uninvolved in [the children's] daily lives that he was not aware for months that the children had been removed again in January 2016." Accordingly, we find that Father was afforded sufficient opportunity to demonstrate that he could provide for his children.

{¶ 45} Similarly, we are unpersuaded by Father's argument that although he continued to produce positive drug screens, there was no evidence produced indicating that his drug usage impaired his parenting ability. The juvenile court found that "BCCS provided plenty of historical evidence as to his lack of appropriate parenting during the times he acknowledged use. The concern related to Father's ongoing abuse of cocaine is substantial." Father contends the record does not support this finding.

{¶ 46} The record reflects that Father began using cocaine in 2006 or 2007. At that time, he was in a band and would use cocaine primarily on the weekends with other band

members. When Father moved out of maternal grandmother's home in 2013, Father remained in the band and continued using cocaine. As discussed above, Father had significant concerns with Mother's ability to care for the children when he moved out in 2013. Despite those concerns, Father left the children with Mother in the maternal grandmother's home and did not take any measures to ensure that they were healthy or secure in that environment. Moreover, notwithstanding his concerns with the children's care, Father only visited the children for a few hours on some weekends.

{¶ 47} After BCCS filed its complaints, and became involved with Father and the children, Father indicated he stopped using cocaine. The record indicates that Father tested negative for cocaine from mid-2016 to mid-2017. During that time, Father was engaging in substance abuse counseling, which he satisfactorily completed. However, when his substance abuse counseling ended, Father began consistently testing positive for cocaine in July 2017, which resulted in an immediate change in his visitation with the children. Father adamantly denied using cocaine in 2017 but could not explain the several positive tests since July 2017. Father speculated that a friend was giving cocaine to Father without his knowledge, however, his mental health therapist testified that such an allegation was not credible. It was further explained that Father's denial of cocaine use despite the positive screens was indicative of a substance abuse problem.

{¶ 48} When considering Father's past behavior while using cocaine, primarily focusing on his indifference towards the children's care and environment, we find sufficient credible evidence exists in the record to show that Father's cocaine use was a legitimate and substantial concern. The majority of progress Father made in his case plan services, which resulted in the liberalization of his visitation with the children, occurred while he was testing negative for cocaine. However, beginning in mid-2017, Father consistently provided cocaine-positive drug screens which continued after the filing of the permanent custody

motion. Father's inability or unwillingness to stop using cocaine, even after his visits with the children were restricted as a direct consequence of his cocaine use, does not portend well for his prospects to effectively parent A.S. and Y.S. Exacerbating this concern are Father's denials of cocaine use, which prevent Father from engaging in further treatment and addressing his cocaine abuse. As a further consequence of Father's drug use, the children experienced minimal unsupervised visitation with him during the pendency of the case.

{¶ 49} Ultimately, we reject Mother and Father's arguments that granting permanent custody of the children was not in their best interests and that either Mother or Father could provide the children with a legally secure permanent placement. Both Mother and Father point to their progress in their respective case plan services as evidence that a legally secure permanent placement for the children could be achieved without granting permanent custody to the agency; however, as discussed above, the record reflects that the juvenile court did an extensive examination of the best interest factors prior to granting BCCS's motions for permanent custody. In doing so, the juvenile court considered Mother's and Father's progress in the case plan services, but ultimately found that they cannot maintain the stable, structured, and safe environment that the children need. "[T]he key concern is not whether the parent has successfully completed the case plan, but whether the parent has substantially remedied the concerns that caused the [children's] removal from the parent's custody." *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. As such, although Mother and Father have completed certain case plan services, and have demonstrated that they genuinely love and care about their children, we find they have failed to alleviate BCCS's concerns which prompted the children's removal.

## Conclusion

{¶ 50} The juvenile court did not err in granting BCCS's motions for permanent

custody. This is because, as discussed more fully above, the juvenile court's decision to grant permanent custody was supported by clear and convincing evidence and was otherwise not against the manifest weight of the evidence. The juvenile court, just like this court, must act in a manner that places A.S.'s and Y.S.'s best interests above all else. "[Children's] best interests are served by the [children] being placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60, quoting *In re Keaton*, 4th Dist. Ross Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, ¶ 61. The children need permanency and cannot and should not wait until their parents are able to resolve their issues. A grant of permanent custody to the agency, where A.S. and Y.S. can be adopted by a family that can provide for their basic needs, is the only viable solution. Therefore, finding no merit to any of the arguments raised herein by Mother or Father, Mother's and Father's assignments of error are overruled and the juvenile court's permanent custody determination is affirmed.

{¶ 51} Judgment affirmed.

HENDRICKSON, P.J., and S. POWELL, J., concur.