[Cite as *In re C.L.*, 2025-Ohio-2814.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

IN RE:                                            :

C.L, et al.                                       :        CASE NOS. CA2025-04-029
                                                                    CA2025-04-030
                                                  :                 CA2025-04-031
                                                                    CA2025-04-032
                                                  :
                                                           OPINION AND
                                                  :        JUDGMENT ENTRY
                                                           8/11/2025
                                                  :


APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 2021JC5441; 2021JC5442; 2021JC5443; 2024JC5701


Holly M. Simpson, for appellant.

Vivian L. Martin, guardian ad litem.

Zachary Faris, for father.

Mark J. Tekulve, Clermont County Prosecuting Attorney, and Nicholas A. Horton, Assistant Prosecuting Attorney, for appellee.


# O P I N I O N

SIEBERT, J.

{¶ 1}  Appellant, E.Y. ("Mother"), appeals the decision of the Clermont County

Court of Common Pleas, Juvenile Division, granting permanent custody of her four children, Gus (age 13), John (age 10), Tyler (age 5), and Jane (age 18 months) to the Clermont County Department of Jobs and Family Services ("the Agency").[1] Gus and John are not H.P.'s ("Father") biological children, but Tyler and Jane are. Gus and John's fathers played no part in the underlying proceedings.

{¶ 2} Mother asserts three assignments of error on appeal, arguing granting custody to the Agency (1) was improper because the Agency did not take reasonable efforts to give custody back to Mother, (2) violated her constitutional rights, and (3) was against the manifest weight of the evidence. We overrule them all. The facts and legal reasoning behind the trial court's decision to grant permanent custody to the Agency do not support any of Mother's assignments of error. Mother refused to meaningfully address the risk Father posed to her children as well as herself by engaging in counseling, parental education, and, as eventually proved necessary, through ceasing contact with him. As a result, Father's continued presence in the lives of the children jeopardized their best interests and Mother's ability to provide for them.

## I. Background

{¶ 3} The Agency came into contact with Mother in October 2021 after reports of domestic violence by Father against Mother. There were also reports of drug use. According to the children's guardian ad litem ("GAL"), "the children[2] [were] witness to a significant amount of domestic violence between the parents." Mother's case plan later stated the children were conditioned to leave the room when Mother and Father began fighting. The Agency filed a complaint in December 2021 and alleged Gus, John, and

---

1. "Gus," "John," "Tyler," and "Jane" are a pseudonyms adopted for this opinion for the purposes of privacy and readability. *In re D.P.* 2022-Ohio-4553, ¶ 1, fn. 1 (12th Dist.).

2. Jane had not been born yet.

Tyler were neglected children. The court adjudicated them as neglected and granted temporary custody to the Agency in early 2022.

{¶ 4} The court ordered multiple extensions of the Agency's temporary custody until July of 2023 when Mother filed a petition for custody, and the Agency filed a motion for permanent custody. In January of 2024, Mother gave birth to Jane. The trial court found Jane to be a dependent child, and after receiving emergency custody, the Agency requested permanent custody of her as well. The court held a permanent custody hearing for Gus, John, and Tyler in February of 2024 and held another hearing for Jane in April of 2024. The magistrate took additional testimony in June of 2024 after the court received reports that Father violated protection orders to have no contact with Mother. The magistrate subsequently granted permanent custody of all four children to the Agency. Mother and Father filed objections to the magistrate's decision, but the court adopted the magistrate's decision in April of 2025.

{¶ 5} Throughout these proceedings, both Mother and Father participated in case planning services. Mother's plan included individual counseling, substance abuse treatment, housing and employment assistance, as well as parental and domestic violence education. Among other things, the case plan noted that Mother "is in a violent relationship with [Father]" and that she "needs housing on her own so she can provide a safe environment for her and her children." Before the Agency's intervention, Mother was largely dependent on Father (and his mother) for housing and financial stability. The case plan further noted that John and Gus were regularly exposed to domestic violence while living with Mother and Father and were to be enrolled in counseling to deal with issues arising from their exposure to that violence.

{¶ 6} After the Agency received temporary custody of the children, it amended

Mother's case plan to reflect a goal of reunifying Mother with the children. Generally speaking, Mother participated in case plan services, repeatedly stated she intended to leave Father, received referrals to domestic violence shelters and programs such as Women Helping Women, and obtained protection orders against Father. But Mother also consistently returned to Father, did not follow through on referrals or the advice of service professionals, and dropped or ignored protection orders against Father.

{¶ 7} As a result, domestic violence by Father against Mother remained an ongoing concern throughout the proceedings. In May of 2022, another purported domestic violence incident occurred, and Mother suffered a broken foot. Although Mother previously told her case worker that she and Father were not together, Mother admitted to having some contact with Father around this time. In October of 2022, Father was banned from Mother's apartment after another instance of domestic violence, but the resulting charges were eventually lowered to disorderly conduct.

{¶ 8} Despite this uneven progress, an agency case worker testified that as time passed, Mother and Father appeared to be "making effort to . . . work on themselves individually and together as a couple." The Agency revised the case plan on multiple other occasions to give Mother and Father additional parenting time, and the Agency eventually allowed the children to visit Mother on weekends.

{¶ 9} Any semblance of progress in this regard collapsed during the children's first weekend visit to Mother's home in July of 2023. Father, uninvited and still banned from Mother's property, arrived at Mother's home and assaulted her in front of the children. Mother was pregnant with Jane at the time. Father was arrested and charged with strangulation, domestic violence, criminal trespassing, and driving on a suspended license. Even though a protection order was in place, Mother participated in over 50 calls

with Father while he was in jail for the assault and pleaded with the prosecutor and judge for leniency on behalf of Father. Following the assault, the Agency again updated Mother's plan, stating "Mother is still having contact with [Father] despite a recent DV incident and a no contact order put in place through the criminal case. Due to continued concern of DV and [Mother] not showing protective capacities, unsupervised visits will stop and be moved back to the agency."

{¶ 10} At times, Gus refused to visit Mother because she continued to see Father. In an in camera interview, Gus stated he desired to remain with his foster family and that he did not feel safe at home with Mother and Father. The wishes of the other children could not be discerned due to their age, but the GAL recommended that the court grant the Agency custody of all children.

{¶ 11} Despite this history of abuse and its impact on the children, Mother later told her caseworker she believed Father had changed as a result of their case planning efforts, was no longer a threat, that they were back together, and that Mother planned to raise the children with him. After the February of 2024 permanent custody hearing, Father was arrested for violating a protection order (again) when he was pulled over for a traffic violation with Mother in the car. Mother dismissed the protective order in March of 2024 believing it was not fair for Father to be able to visit Jane (the newborn) and not Tyler.

{¶ 12} Each parent also experienced a relapse of drug abuse. Between the permanent custody hearings in February and April of 2024, Mother tested positive for fentanyl, norfentanyl, and gabapentin. Father relapsed around the same time on methamphetamine and gabapentin. As noted by the trial court, "Mother's visits with the children became more sporadic after February of 2024, reportedly due to illness and car

problems[, but] . . . this time coincides with Mother and [Father] getting back together and their subsequent relapses."

{¶ 13} Mother's parenting educator believed that Mother is "a good mother," possessed "really good ideals as far as parenting," that "[t]he kids love her[,]" and that Mother's home was suitable for the children. However, she testified that Mother and Father exhibit vastly different parenting philosophies, with Father possessing "strict disciplines that were a little extreme." The parental educator was unable to bridge the parenting philosophy gap between Mother and Father, and she believed that Father's presence negatively impacted Mother. Mother testified she stopped attending parental education appointments because "every time [the educator would] come over, she would want to know about my week, be worried about [Father's] business . . . [and] not teaching [her] the stuff that they were supposed to be teaching." As a result, Mother "felt like there was no point in it anymore."

{¶ 14} After the Agency took temporary custody of the children, they were all placed with the same foster family. By all accounts, the children bonded well with their foster family. In addition, Gus and John are engaged in school as well as organized and unorganized extracurricular activities (sports, playing with farm animals at home, playing catch, and wrestling). The foster father testified at the custody hearing that he and his wife would be willing and able to adopt the children. Both the Agency caseworker and the children's GAL believed the children bonded well with the foster parents, and it was in the best interest of the children for the Agency to have permanent custody.

## II. Law and Analysis

### A. Third Assignment of Error: Manifest Weight and Sufficiency

{¶ 15} We address Mother's third assignment of error first, as it informs our

analysis of her other two assignments of error. Mother argues that all testimony given at the permanent custody hearing refutes the trial court's determination that Mother could not provide a legally secure placement for the children. We disagree.

### 1. Standard of Review for Permanent Custody Decisions

{¶ 16} "An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re A.S.*, 2019-Ohio-4127, ¶ 19 (12th Dist.). However, "[e]ven if there is sufficient evidence to support the juvenile court's decision, an appellate court may nevertheless reverse a permanent custody judgment if it finds the judgment to be against the manifest weight of the evidence." *In re G.A.*, 2023-Ohio-643, ¶ 18 (12th Dist.), citing *In re F.S.*, 2021-Ohio-345, ¶ 61 (12th Dist.).

{¶ 17} To determine whether a juvenile court's judgment is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 2019-Ohio-198, ¶ 16 (12th Dist.), quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence favors the finder of fact, which we are especially mindful of in custody cases. *In re R.K.*, 2021-Ohio-3074, ¶ 15 (12th Dist.). Therefore, if the evidence is susceptible to more than one construction, the reviewing court is bound to give it the interpretation that is consistent with the trial court's judgment. *In re D.S.*, 2022-Ohio-998, ¶ 63 (12th Dist.).

### 2. The Two-Part Permanent Custody Test

{¶ 18} "Before a natural parent's constitutionally protected liberty interest in the

care and custody of [her] child may be terminated, the [S]tate is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met." *In re M.G.*, 2023-Ohio-1316, ¶ 44 (12th Dist.). The juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re K.P.*, 2022-Ohio-1347, ¶ 17 (12th Dist.).[3]

### a. Part 1: Consideration of "Best Interest of the Children" Factors

{¶ 19} First, the juvenile court must find that granting permanent custody to the Agency is in the "best interest" of the children. R.C. 2151.414(B)(1), (D), *In re M.H.*, 2022-Ohio-48, ¶ 35 (12th Dist.). To determine the best interest of the children, the juvenile court had to consider all relevant factors, including, but not limited to:

> (a) the interaction and interrelationship of the child with the child's parents, foster caregivers, and others;
>
> (b) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem;
>
> (c) the custodial history of the child;
>
> (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and
>
> (e) the existence of one or more broad factors listed in R.C. 2151.414(E) which includes, but is not limited to (1) whether the parent "has failed continuously and repeatedly to substantially remedy" the conditions that caused the child's placement with the Agency; (2) a parent's

---

3. {¶ a} The juvenile court granted the Agency permanent custody of John, Gus, and Tyler under the two-part test outlined in R.C. 2151.414(B)(1) and discussed below. However, the court granted permanent custody of Jane to the Agency pursuant a different statute–R.C. 2151.353(A)(4). Under the latter, juvenile courts must consider (1) whether a child cannot or should not be placed with parents within a reasonable time after considering the "Parental Placement Factors" and (2) the "best interests" of the child. Both of these terms are defined in the body of this opinion.

{¶ b} Despite being different statutes, the considerations under each are similar. While we frame our discussion as to all children in this case under R.C. 2151.414(B)(1), Mother's sufficiency and manifest weight arguments fail under both statutes.

unwillingness to prevent emotional abuse; and (3) the involuntary termination of parental rights with respect to a sibling of the child (the "Parental Placement Factors").

*See In re J.C.*, 2018-Ohio-1687, ¶ 22 (12th Dist.); R.C. 2151.414(D)(1)(a) thru (e). A juvenile court may also consider any other factors it deems relevant to the child's best interest. *In re A.J.*, 2019-Ohio-593, ¶ 24 (12th Dist.). The juvenile court considered each of these "best interest of the children" factors, and this court agrees with that court's findings.

{¶ 20} **Interaction and interrelationship of the children with parents, foster caregivers, and others:** The Agency does not contest the children and Mother share a bond and love each other. However, there is no doubt that exposing the children to the repeated abuse of Mother at the hands of Father bears a negative impact on their relationship. This is more readily apparent with Gus, who has refused to visit Mother because Mother continues to see Father. Mother's visits with the children becoming less frequent beginning in February 2024—whether due to illness and car problems or due to a drug relapse alongside Father—is also concerning.

{¶ 21} Attempts to address Father's violence (and Mother's response to said violence) took so long that the children are now integrated into another family. The record shows the foster family fully accepts the children, John and Gus are engaged in their schooling, and they participate in extracurricular activities. This stable and beneficial situation can continue as the foster family is interested in adopting all four children.

{¶ 22} The interaction and interrelationship factor weighs in favor of granting the Agency custody.

{¶ 23} **The wishes of the children:** Gus stated in an in camera interview that he wished to remain with his foster family and that he did not feel safe at home with Mother

and Father. While the exact wishes of the other children could not be discerned due to their age, the GAL recommended that the court grant the Agency custody of all children.

{¶ 24} The children's wishes factor also favors the Agency.

{¶ 25} **Custodial history of the children:** By the time of the permanent custody hearings, the children had been in the Agency's custody for two and one-half years, and in the case of Jane, her entire life.

{¶ 26} The custodial history factor also favors an award of permanent custody to the Agency.

{¶ 27} **The children's need for a legally secure permanent placement:** Mother contends that her progress with her case plan as well as her stable housing demonstrates she can provide a legally secure and permanent placement for her children. But as noted by the juvenile court, "[a] legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *In re A.U.*, 2024-Ohio 5464, ¶ 33 (4th Dist.) quoting *In re M.B.*, 2016-Ohio-793, at ¶ 56 (4th Dist.).

{¶ 28} No one disputes that Father repeatedly beat Mother in front of the children. Despite the physical and mental effects of this on herself and her children, Mother still frequently associated with Father or allowed him to see her in violation of protection orders. Not only that, but Mother dismissed protective orders against Father and advocated on his behalf to lessen the legal consequences of Father's violence. Thus, despite Mother's progress in other facets of her case plan, nothing in the record inspires any confidence that Mother will ever seek to meaningfully address or sever herself from the condition that led to the removal of her children in the first place—Father's abuse.

{¶ 29} Parents are "'afforded a reasonable, not an indefinite, period of time to remedy the conditions causing the children's removal.'" *In re A.M.L.*, 2013-Ohio-2277, ¶ 32 (12th Dist.), quoting *In re L.M.*, 2011-Ohio-1585 (11th Dist.). In the over two and a half years since the Agency first came into contact with Mother, Mother and Father never went more than a matter of month without a (documented) instance of domestic violence. All the while, the children have been accepted into a loving foster family that is ready and willing to provide a permanent, legally secure home for them.

{¶ 30} The children's need for a legally secure placement factor favors an award of permanent custody to the Agency.

{¶ 31} **Parental Placement Factors**: As established in our analysis of the other factors, the record demonstrates that Mother failed to substantially remedy the condition that caused the children to be placed with the Agency—Father. Mother's continuous and repeated failure to work with the Agency and the courts to curb Father's oftentimes violent presence shows her unwillingness to prevent further emotional and physical abuse to herself and the children.[4] Mother's unwillingness to extricate herself and the children from Father in light of his abuse also demonstrates her unwillingness to prevent the emotional abuse that they almost undoubtedly experience by witnessing this violence. When the juvenile court involuntarily terminated Mother's parental rights as to each of the four children, that action supported involuntarily terminating her parental rights as to the others.

{¶ 32} The Parental Placement Factors also favor granting permanent custody to the Agency.

---

4. For the same reasons, we agree with the juvenile court's determination that Jane could/should not be returned to either parent within a reasonable time under R.C. 2151.353(A)(4).

{¶ 33} Because the juvenile court considered all five of the "best interest of the children" factors, it satisfied part one of its statutory duties. The juvenile court then proceeded to make findings pursuant to the second part of the statutorily required analysis before deciding on permanent custody.

### b. Part 2: Legal Circumstances of the Children

{¶ 34} Second, the juvenile court must find that at least one of the legal circumstances listed in R.C. 2151.414(B)(1)(a) to (e) applies (the "Legal Circumstances"). *See In re R.B.*, 2022-Ohio-1705, ¶ 31 (12th Dist.); *In re C.S.*, 2020-Ohio-4414, ¶ 16 (12th Dist.). The relevant Legal Circumstance in this case is whether the children were in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1)(d).

{¶ 35} The trial court concluded that John, Gus, and Tyler were in the Agency's custody for at least 12 months of a consecutive 22-month period.[5] Mother does not challenge this finding.

{¶ 36} We conclude the juvenile court satisfied the two-part permanent custody test. It heard testimony from Agency employees familiar with the case, the GAL, the foster father, Mother, and Father. Further, the juvenile court conducted an in camera interview with Gus, the only child old enough to sufficiently express his wishes. Upon review, the evidence and record supported the trial court's findings that granting permanent custody of the children to the Agency was in the "best interest of the children" and that the "12 of 22" Legal Circumstance was satisfied. Stated differently, granting permanent custody to the Agency was not against the manifest weight of the evidence.

---

5. The juvenile court was not required to make a "Legal Circumstance" finding as to Jane because, again, custody of her was granted under a different statutory framework.

{¶ 37} We overrule Mother's third assignment of error.

## B. First Assignment of Error: "Reasonable Efforts" by the State

{¶ 38} Mother's first assignment of error argues that the State did not make reasonable efforts under R.C. 2151.419(A)(1) to prevent removal of the children before filing a motion for permanent custody because Mother's case plan did not expressly call for her to cease all contact with Father. Mother's arguments lack legal merit.

## 1. Applicable Law and the "Plain Error" Standard of Review

{¶ 39} Public children services agencies have a general duty to "[m]ake reasonable efforts to prevent the removal of an alleged or adjudicated abused, neglected, or dependent child from the child's home . . . or make it possible for the child to return home safely." R.C. 5153.16(A)(19). Stated differently, "except for a few narrowly defined exceptions, the [Agency] must have made reasonable efforts to reunify the family prior to the termination of parental rights." *In re C.F.*, 2007-Ohio-1104, ¶ 21. But "'[r]easonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *In re K.M.*, 2004-Ohio-4152, ¶ 23 (12th Dist.)*.

{¶ 40} Mother did not raise this assignment of error at the trial level via her objections to the magistrate's decision. As a result, she has forfeited all but plain error. *In re S.M.*, 2015-Ohio-2318, ¶ 27 (12th Dist.), citing Civ.R. 53(D)(3)(b)(iv). A party asserting plain error must show an obvious error that "'seriously affects the basic fairness, integrity . . . [and] legitimacy of the underlying judicial proceedings.'" *Richards v. Newberry*, 2015-Ohio-1932, ¶ 14 (12th Dist.), quoting *Goldfuss v. Davidson* 79 Ohio St.3d 116 (1997), syllabus. Stated differently, plain errors "'must have affected the outcome'" of the proceedings. *State v. Rogers*, 2015-Ohio-2459, ¶ 22, quoting *State v. Barnes*, 94 Ohio

St.3d 21, 27 (2002).

## 2. Mother Fails to Demonstrate Any Error

{¶ 41} Mother cannot demonstrate any error on appeal, plain or otherwise. Mother argues "the case plan did not even include the one requirement that prevented Mother from gaining custody of her children—cutting off contact with Father." But under these circumstances, we doubt such an express requirement would have made any difference as Mother frequently acquiesced to or ignored Father's flouting of court-issued protection orders—such as when Jane was born—and even moved to have them dismissed by the relevant court. Moreover, Mother's case plan *always* called for her to substantially alter her personal, financial, housing, and, most importantly, *parental* relationship with Father. The Agency gave her various avenues to pursue these goals, including (as relevant here) providing her with parental education and referrals to domestic violence shelters and programs such as Women Helping Women. While Mother undoubtedly made strides in other parts of her case plan, the Agency updated the case plan after the July 2023 domestic violence incident to reflect the Agency's "continued concern of DV and [Mother] not showing protective capacities."

{¶ 42} Despite this, Mother adamantly asserted her intent to raise her children with Father. Further, while Mother claimed she stopped attending parental education appointments because they were "not teaching [her] the stuff that they were supposed to be teaching [her]" the record demonstrates Mother simply desired to ignore what the Agency and her parental education teacher were telling her—Father proved himself time and time again to be an incompatible and dangerous partner with whom to raise her children. It should have been evident to Mother, even if not expressly stated in her case plan, that in the event she and Father were unable to rehabilitate their relationship, she

would have to sever herself from him or risk losing her children. As a result, we conclude that the Agency did make reasonable efforts to reunify this family. The same cannot also be said for Mother.

{¶ 43} We also overrule this assignment of error.

### C. Second Assignment of Error: Constitutional Considerations

{¶ 44} Finally, Mother argues that granting permanent custody to the Agency amounts to unconstitutional discrimination "for being the victim of a crime." She further asserts that the proceedings unfairly faulted her for "failing to protect the children from Father's violent outbursts . . . [when] [i]t is clear from the record that Father was never violent with the children." Such actions, she claims, unfairly "equated her with Father when evaluating the suitability of custody."

{¶ 45} Importantly, Mother does not argue that the relevant statutes are unconstitutional. As a result, our conclusion that the manifest weight of the evidence supported the juvenile court's order granting permanent custody to the Agency effectively renders this assignment of error moot.

{¶ 46} However, because this court understands how fundamental the constitutional right to parent children is within our system of government, we feel compelled to address Mother's characterization of these proceedings. We agree that it is not Mother's fault that Father, among other transgressions, broke into Mother's home in July of 2023 (a property he was banned from) and proceeded to strangle her. But the record shows that despite this striking display of violence, Mother still accepted phone calls from Father while he was in jail, pled with the prosecutor and court for leniency for Father, asserted to Agency case workers that Father "had changed," and she intended to raise the children with him. Ultimately, the juvenile court did not grant permanent

custody to the Agency because Mother was the victim of a crime. It did so because after Father victimized her (yet again), Mother *still* refused to substantially alter or, in the event that did not work, end their relationship to protect her children from the very real harms they sustained. The juvenile court acted within its authority to protect the children."

{¶ 47} Of course, all involved in this case are relieved Father's violence has not resulted in direct physical harm to the children. But evidence of this trauma is clear in the record—the children have been conditioned to leave the room when Mother and Father start fighting. Even so, it strains credulity to think the children did not hear the ensuing blows, cries, and screams. As Mother admits in her briefing, "witnessing violence is [undoubtedly] detrimental to the children."

{¶ 48} The law does not require the court to take a wait and see approach or "'to experiment with a child's welfare.'" *In re G.W.*, 2019-Ohio-1586, ¶ 52 (12th Dist.), quoting *In re B.C.*, 2018-Ohio-2673, ¶ 30 (12th Dist.), *In re R.S.-G.*, 2015-Ohio-4245, ¶ 53 (4th Dist.). Stated differently, the courts "cannot wait idly by while Mother continues to place herself in [an] oftentimes violent personal relationship[] with [Father]" because he has, up to this point, not *physically* harmed the children. *In re G.W.*, 2019-Ohio-1586, ¶ 53 (12th Dist.). Ultimately, Mother's waffling action in response to Father's violence exposed the children to not only the risk of physical harm, but of continuing and growing emotional harm.

{¶ 49} We overrule this final assignment of error.

### III. Conclusion

{¶ 50} The juvenile court did not make this decision lightly—it did so after a careful and thorough evaluation of the record before it. Upon review, the manifest weight of the

- 16 -

evidence supports the juvenile court granting permanent custody to the Agency. Mother's unwillingness to meaningfully address and protect herself and her children from Father's violence made it in the children's best interest to be in the custody of the Agency.

{¶ 51} To be sure, Father victimized Mother in an oft-repeated cycle of domestic violence. This court recognizes Mother's human worth—she is more than a punching bag—and she cannot be held responsible for Father's acts of violence against her. But she can—and must—be held responsible when her actions, or in this case, her refusal to act, repeatedly exposed the children to trauma by witnessing this continued violence. When parents will not act in the best interests of their own children by ending damaging cycles like this on their own, the State has the authority and responsibility to do so with due regard for the fundamental rights of parents. Ultimately, the State protected the children when Mother did not. By doing so, this court hopes it gave the children an understanding that this pattern of violence is unacceptable—so that their own children have a much higher chance to not repeat the same cycle in their future relationships.

{¶ 52} Judgment affirmed.

PIPER, P.J., and M. POWELL, J., concur.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Clermont County Court of Common Pleas, Juvenile Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robin N. Piper, Presiding Judge

/s/ Mike Powell, Judge

/s/ Melena S. Siebert, Judge