[Cite as *In re of A.G.*, 2024-Ohio-2136.]

IN THE COURT OF APPEALS OF OHIO

TENCH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | No. 23AP-55 |
| [A.G., | : | (C.P.C. No. 19JU-4406) |
| B.G., Mother, | : | (REGULAR CALENDAR) |
| Appellant]. | : | |

D E C I S I O N

Rendered on June 4, 2024

**On brief:** *Yeura R. Venters*, Public Defender, and *Timothy E. Pierce*, for appellant. **Argued:** *Timothy E. Pierce*.

**On brief:** *Robert J. McClaren*, for appellee, Franklin County Children Services. **Argued:** *Robert J. McClaren*.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

MENTEL, P.J.

{¶ 1} Appellant, B.G., mother of A.G., appeals the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch ("juvenile court") granting the motion for permanent custody of A.G. filed by Franklin County Children Services ("FCCS"). For the following reasons, we reverse and remand this matter to the juvenile court.

## I. Factual and Procedural Background

{¶ 2} On April 11, 2019, FCCS filed a complaint in the juvenile court alleging that A.G. was a neglected child under R.C. 2151.03(A)(2) and a dependent child under R.C. 2151.04(C). FCCS stated that it had received a report that B.G. had brought A.G. to the emergency room at Nationwide Children's Hospital because she had blood in her urine, stool, and vomit. A.G. had been hospitalized twice before for similar reasons. B.G. alleged that her daughter had "been having episodes of not breathing at home." (Apr. 11, 2019

Compl. at 1.)   However, hospital personnel believed that B.G. was "fabricating" her daughter's symptoms.  They had concerns that B.G.'s insufficient bottle feeding of A.G. put her "at risk for malnutrition" and her "weight [was not] progressing appropriately."  *Id.* FCCS alleged that B.G. could not financially support her daughter and suffered from "significant mental health issues" that remained untreated.  *Id.* at 2.  B.G. had reported that she was a victim of human trafficking, having been abducted, transported to Colorado, and kept in a basement until she escaped and returned to live with her father in Columbus.  *Id.* FCCS claimed that B.G. had not followed through with a number of services the agency had provided or referred her to.  *Id.*  The complaint alleged that B.G. and her father had been evicted several days before, and that he had physically assaulted B.G in front of A.G.  *Id.* Citing B.G.'s "inability to provide for the basic needs" of her daughter, FCCS sought an order of temporary custody.  *Id.*

{¶ 3}   At the temporary custody hearing, the magistrate asked B.G. if she had "any Indian in your background, American Indian in your background?"  (Apr. 12, 2019 Tr. at 4.)  B.G. replied: "I don't think so."  *Id.*  In the order granting the motion for temporary custody, the magistrate noted, "No ICWA," with apparent reference to the Indian Child Welfare Act ("ICWA"), 25 U.S.C. 1901 et seq.  (Apr. 12, 2019 Mag.'s Order at 1.)

{¶ 4}   The magistrate held a hearing on the complaint on July 9, 2019, at which time FCCS requested dismissal of the charge of neglect and stated that the dependency charge was uncontested.  (Aug. 26, 2019 Mag.'s Decision at 1.)  B.G. did not appear at the hearing. *Id.*  Finding the "facts as alleged in the complaint" to be "uncontested," the magistrate found A.G. to be a dependent child under R.C. 2151.04(C), terminated the original temporary custody order, and committed A.G. to temporary court custody under R.C. 2151.353(A)(2). *Id.* at 1-2.  The magistrate also adopted the case plan as an order of the court and ordered B.G. to complete it, along with parenting classes.  *Id.* at 2.  The juvenile court adopted the magistrate's decision and entered it as a judgment of the court.  (Aug. 26, 2019 Jgmt. Entry.)

{¶ 5}   Eleven months later, the magistrate extended the order of temporary court custody and adopted FCCS's amended case plan.  (July 28, 2020 Mag.'s Decision at 1.)

B.G.'s attorney attended the hearing, but she did not. *Id.* The juvenile court adopted this order as a judgment of the court. (July 28, 2020 Jgmt. Entry.)

{¶ 6} In a court review of A.G.'s placement entered on September 29, 2020, the juvenile court concluded that FCCS had "made reasonable efforts to finalize permanency planning" for A.G under R.C. 2151.417. (Sept. 29, 2010 Findings of Fact and Conclusions of Law at 1.) The juvenile court found that A.G. had been in the custody of FCCS since April 12, 2019, and that the agency had asked B.G. to visit her "on a consistent basis." *Id.* FCCS had also asked her to submit to random drug testing and a mental health assessment. *Id.* However, B.G. had "not visited the child since May 2019" because she had "moved out of state and has not returned." *Id.* B.G. had "not completed any case plan services" developed by FCCS. *Id.*

{¶ 7} The same day, FCCS filed a motion for permanent custody. In support of the motion, FCCS stated that A.G. had been in foster care since the first temporary custody order on April 12, 2019, where she was "doing well." (Sept. 29, 2020 Mot. for Permanent Custody at 4.) FCCS alleged that B.G. had not submitted to a mental health assessment or participated in any drug screens, and had "not engaged in any case plan services whatsoever." *Id.* at 5. According to the agency, B.G. had "moved to Colorado in January 2020," did not visit A.G., and was "not working on her case plan objectives toward reunification." *Id.* FCCS had never had contact with A.G.'s father. *Id.* FCCS argued that B.G.'s abandonment of A.G., her refusal to complete the case plan, and the fifteen months that A.G. had been in the agency's custody all demonstrated that granting permanent custody to it was in A.G.'s best interest. *Id.* at 6-7.

{¶ 8} A hearing on the motion for permanent custody was originally scheduled for January 12, 2012. (Oct. 5, 2020 Notice of Hearing.) However, the hearing was continued multiple times. At first, the continuances occurred because B.G. could not be served, and her attorney accepted service of the motion on her behalf. (Jan. 13, 2021 Mot. for Continuance & Entry; Feb. 24, 2021 Mot. for Continuance & Entry.) The hearing was subsequently continued five times because B.G. was either unwell enough to travel from Colorado to Ohio for the proceeding, or was "unavailable." (Aug. 25, 2021 Mot. for Continuance & Entry; Nov. 4, 2021 Mot. for Continuance & Entry; Apr. 6, 2022 Mot. for

Continuance & Entry; Apr. 25, 2022 Mot. for Continuance & Entry; May 13, 2022 Mot. for Continuance & Entry.) On November 7, 2022, the juvenile court finally commenced a three-day trial on the motion for permanent custody.[1]

{¶ 9} FCCS called Juanita Ramsey as witness, a caseworker and child protection specialist who became involved with the case when A.G. was hospitalized. She testified about the case plan requirements, which included: completing a parenting class, a mental health assessment, and random drug tests, as well as obtaining stable housing and "verifiable income in order to take care of the child." (Nov. 7, 2022 Tr. at 38.) On cross-examination, Ms. Ramsey was shown a document stating that B.G. had completed a parenting class on October 15, 2019. (Nov. 8, 2022 Tr. at 24.)

{¶ 10} The case plan also required B.G. to meet with Ms. Ramsey "at least once every 30 days," and she was allowed to visit A.G. "at least" on a weekly basis. (Nov. 7, 2022 Tr. at 39.) Ms. Ramsey offered B.G. bus passes and rides to the drug testing facility, "but she refused." *Id.* at 44. B.G. did not complete any drug testing. *Id.* She subsequently moved to Lima, Bowling Green, Tulsa, Seattle, and Colorado. *Id.* at 42. Ms. Ramsey attempted to refer B.G. to drug testing in Colorado, including transportation to complete it, but she refused to go. *Id.* at 44-45. B.G. did send a lease agreement for the Colorado apartment, but refused to let Ms. Ramsey see the home over video chats when asked. *Id.* at 46-47. After giving birth to A.G. and leaving Ohio, B.G. had three additional children. *Id.* at 46. Ms. Ramsey sent B.G. a physical copy of the case plan, but it was returned through the mail. *Id.* at 49. Their contact was "very sporadic," as B.G. would often not respond to Ms. Ramsey's texts or emails asking to set up video chats. *Id.* at 48-49.

{¶ 11} When B.G. was still in Ohio, she was to have weekly visits with A.G., but only participated in one in-person visit there. *Id.* at 50-51. Ms. Ramsey observed one virtual visit between B.G. and A.G. in December of 2020, during which A.G. refused to call B.G. "mom." *Id.* at 52-53. Ms. Ramsey worked on the case from April 2019 until 2021, during which time she observed two video visits between B.G. and A.G. (Nov. 8, 2022 Tr. at 42.)

---

[1] B.G. did not travel from Colorado to attend the trial. Court was delayed the first day for several hours to give her the opportunity to participate via Zoom, but it is not apparent from the transcript when or if she logged on that day. (*See* Nov. 7, 2022 Tr. at 3-18.)

{¶ 12} Ms. Ramsey testified that A.G. and her foster mother have "a very unique bond," describing A.G. as an openly affectionate child who "would tell her [foster mother] how much she loved her all the time" and "giver her hugs" during Ms. Ramsey's visits. (Nov. 7, 2022 Tr. at 57.) A.G.'s foster mother at first "consistently stated that she would like to see" A.G. return to B.G. because she "felt really bad" for B.G. *Id.* Ms. Ramsey opined that the passage of time and the lack of communication from B.G. changed the foster mother's feelings, who wanted what was best for A.G. *Id.*

{¶ 13} FCCS also called Grace Davis, the caseworker who took over for Ms. Ramsey after she left her position. Ms. Davis reviewed the case plan with B.G. on October 25, 2021. (Nov. 8, 2022 Tr. at 60.) The agency was never able to locate A.G.'s putative father. *Id.* at 61. Like Ms. Ramsey, Ms. Davis testified that B.G. refused to take a drug test. *Id.* at 64. B.G. "claimed to have completed a mental health assessment" at an organization in Colorado, but Ms. Davis "never was provided with a copy of that assessment." *Id.* at 65. She did receive a copy of B.G.'s Colorado apartment lease and "documentation for roughly $700 of income a month." *Id.* at 68. B.G. claimed to have pulmonary embolism and blood clots, but did not provide a medical release when Ms. Davis asked for one. *Id.* at 69. B.G. blamed her physical condition, which she claimed required her to have a "medical caregiver to ensure that she remained conscious," on her inability to travel and participate in the case. *Id.* at 70. However, she did not provide any medical documentation of this requirement to Ms. Davis. *Id.*

{¶ 14} Ms. Davis observed "three to four" virtual visitations between B.G. and A.G. *Id.* at 74. A.G. "didn't really interact" with B.G. during the hourlong visits, two of which B.G. stopped after 30-45 minutes. *Id.* A.G. "never referred" to B.G. as her mother during the visits. *Id.* at 75. Ms. Davis observed A.G. as "very bonded" with her foster mother during her observational visits. *Id.* at 77.

{¶ 15} FCCS also called Lisa Blackford, the caseworker assigned to A.G.'s case. She discussed the case plan twice with B.G., and then again in "numerous emails." *Id.* at 106. Ms. Blackford communicated to B.G. that "the most important thing" was that she complete the mental health assessment and treatment, but B.G. "would not discuss it any further."

*Id.* at 107. Like the other caseworkers, she testified that B.G. never completed any drug testing. *Id.* at 108.

**{¶ 16}** Ms. Blackford testified that she had examined the parenting class certificate presented during Ms. Ramsey's cross-examination and had concerns about its validity because it was a "self-referral," which required verification. *Id.* at 109. When she asked B.G. for information about the provider, B.G. responded that she had already provided the information and did not say where the class had taken place. *Id.* at 109-10.

**{¶ 17}** According to Ms. Blackford, she and B.G. communicated by email "two to three times a month." *Id.* at 110. Ms. Blackford obtained approval for B.G. to fly to Columbus to attend court hearings, as well as her medical caregiver: "I said we would purchase * * * flights for whoever was necessary and provide lodging, money for food assistance, in order for her to be able to attend the hearings." *Id.* at 111. She made the offer "[a]t least twice, with one flight being purchased that [was] not used." *Id.* B.G.'s explanation was that she was unable to travel because of her medical conditions. *Id.*

**{¶ 18}** In late 2021, FCCS attempted to initiate a remote home study via the Interstate Compact on the Placement of Children ("ICPC"), but the receiving agency in Colorado "would not initiate the request due to case plan compliance." *Id.* at 113-14. According to Ms. Blackford, 80 percent of the case plan would have to have been completed for the out-of-state agency to accept the request. *Id.*

**{¶ 19}** Ms. Blackford described the online visitation between B.G. and A.G. as inconsistent. *Id.* at 115. Although B.G. was offered weekly visits, "[o]ne month she might attend one, next month she might attend two." *Id.* During the case, there were "gaps of three to four months without logging in." *Id.* The visits that Ms. Blackford observed were "very short." *Id.* B.G. "did not say a lot" to A.G. or the foster mother, "and then it would end" after 20 to 25 minutes. *Id.* at 115-16. After observing A.G. during four in-home visits, Ms. Blackford described the child as bonded and attached to her foster mother. *Id.*

**{¶ 20}** Foster mother, M.L., also testified. FCCS had placed A.G. in her home in April of 2019. *Id.* at 133. Ms. Ramsey asked M.L. to set up weekly video visits between B.G. and A.G. in September of 2020. *Id.* at 134-35. M.L. described B.G.'s attendance of the visits as "sporadic." *Id.* at 136. Since 2021, there had been three 30-day periods of no visits by

B.G. *Id*. at 142. According to M.L., there had "only been six calls in the last year." *Id*. B.G. did not inform M.L. when she would not be participating in the scheduled visits. *Id*.

{¶ 21} M.L. described "a lack of engagement" during the visits. *Id*. B.G. mainly directed her questions about A.G. to M.L. *Id*. A.G. "wouldn't respond" to questions from B.G., and it was up to M.L. "to guide [A.G.] to try and respond and answer her questions." *Id*. at 142-43. A.G. never addressed B.G. or appeared to know who she was. *Id*. at 143.

{¶ 22} M.L. testified that A.G. had turned four the week before trial. *Id*. at 145. She attends Head Start during the day, after which she helps M.L. cook dinner. *Id*. at 145-46. After dinner, A.G. has playtime before bed. *Id*. at 146. A.G. also attends gym and swim classes. *Id*. M.L. stated that she and A.G. are "really bonded." *Id*. A.G. shares her emotions with M.L., whether she is sad, excited, or proud of an accomplishment. *Id*. In addition, A.G. is "incredibly close" with all of M.L.'s family. *Id*. M.L.'s parents attend A.G.'s gym and swim classes, as well as eat dinner with them "several times a week." *Id*. at 146-47. A.G.'s best friend is M.L.'s five-year-old niece. *Id*. at 147. M.L. stated that she "[a]bsolutely" would be interested in adopting A.G. *Id*. at 148. If that happened, M.L. "wouldn't deny [B.G.] any contact or being able to reach out to [A.G.] at any time." *Id*. at 150.

{¶ 23} The final witness was Scott Sidner, A.G.'s guardian ad litem. He testified that he had recently communicated with B.G. via Zoom and had been able to email her. *Id*. at 167. Mr. Sidner had observed B.G. over Zoom and seen her other three children, one of which was an infant. *Id*. at 168. B.G. provided him with information about her medical conditions, including complications from a C-section. *Id*. at 168-69. She also showed her home to him over the video call, which appeared to be "a rectangular shaped townhome" of modest size. *Id*. at 169. The home was furnished, including a "bunkbed combination" with a third bed for A.G. in the children's bedroom. *Id*. at 171. The kitchen had food in the refrigerator and the apartment had a laundry room. *Id*. at 170. B.G. told Mr. Sidner that she lived alone with two girls and a baby, and that her fiancé had his own apartment. *Id*. at 172.

{¶ 24} Mr. Sidner believed that he had observed somewhere between eight to twelve visits, but only one between B.G. and A.G. *Id*. at 175-76. He described their interaction as "appropriate." B.G. mainly talked about "doctor visits" and herself, but "to her credit she

was trying to interact with" A.G. by asking her what she was playing. *Id.* at 177-78. A.G. did not initiate conversation with B.G. *Id.* at 178.

{¶ 25} Mr. Sidner was able to observe A.G. at Head Start, where she played with other children and worked on numbers. *Id.* at 179-80. A.G.'s teacher reported that "she does well with everything." Mr. Sidner also visited the foster home multiple times, both over video and in person. *Id.* at 181-82. He described the relationship between M.L. and A.G. as "loving," "very bonded," and "respectful." *Id.* at 182. Although A.G. was "very bright," she was only four and did not understand the permanent custody proceeding. *Id.* at 183. He asked her privately who she would like to live with "forever," and "she said she wats to live with mommy," meaning M.L. *Id.* Mr. Sidner believed that it was in her best interest to grant FCCS's motion for permanent custody. *Id.* at 182-83.

{¶ 26} The juvenile court granted the motion on December 30, 2022. In its decision, it discussed FCCS's reasonable efforts at reunification at length and determined that they were adequate. However, its discussion omitted any mention of the statutory basis for making the determination. (*See* Dec. 30, 2022 Decision & Jgmt. Entry at 6-8.)

{¶ 27} B.G. appealed and asserts the following assignments of error:

> [I.] The lower court's decision terminating Mother-Appellant's right to parent her child [A.G.] in 19JU-4406 was not founded on sufficient evidence and ran against the manifest weight of the evidence.
>
> [II.] The lower court plainly erred when it terminated Mother-Appellant's constitutional and statutory right to parent her child [A.G.] without determining the county children service agency proved by clear and convincing evidence that the agency had engaged in reasonable efforts to prevent the removal of [A.G.] from Mother-Appellant, eliminate the continued removal of [A.G.] from Mother-Appellant, or make it possible for [A.G.] to return safely home to Mother Appellant.
>
> [III.] The lower court plainly erred when it failed to comply with the Indian Child Welfare Act (ICWA) in the proceedings below.

## II. Standard of Review

{¶ 28} Our review of the second and third assignments of error involve questions of law, which we review de novo. *E.g.*, *Ohio v. Towns*, 170 Ohio St.3d 50, 2022-Ohio-3632,

¶ 9. And although appellate review of a judgment awarding permanent custody is affirmed unless it is against the manifest weight of the evidence, for the reasons discussed below, we will not reach the first assignment of error and review the juvenile court's decision at this time because of the necessity of remand. *E.g.*, *In re A.L.*, 10th Dist. No. 15AP-1040, 2016-Ohio-3189, ¶ 18 (stating standard of review in permanent custody cases).

### III. Second Assignment of Error

{¶ 29} We begin with the second assignment of error, in which B.G. challenges the reasonable efforts determination of the juvenile court. B.G. argues that the juvenile court "erred when it ruled the agency had demonstrated reasonable efforts for reunification between Mother and child." (Brief of Appellant at 47.) Anticipating that FCCS "will argue the reasonable efforts determination was not required," she explains as follows why she believes this position to be "incorrect." *Id.* FCCS filed the motion for permanent custody under R.C. 2151.413, and "R.C. 2151.413(D)(3)(b) indicates the agency shall not file a PCC motion if the agency (when required) has not complied with R.C. 2151.419," the statute governing how the court determines if a children services agency has made reasonable efforts at reunification. *Id.* "R.C. 2151.419(A)(1) references instances where reasonable efforts must be demonstrated, including permanent custody hearings per R.C. 2151.353(A)(4)," she asserts. *Id.* Thus, B.G. believes that the juvenile court properly addressed the reasonable efforts determination, although she disagrees with its conclusion.

{¶ 30} To the extent that B.G.'s argument implies that FCCS was precluded from filing a motion for permanent custody under R.C. 2151.413(D)(3)(b), we must clarify that this was not the case. That provision states: "An agency shall not file a motion for permanent custody under division (D)(1) or (2) of this section if any of" a number of factors apply, including the following: "If reasonable efforts to return the child to the child's home are required under section 2151.419 of the Revised Code, the agency has not provided the services required by the case plan to the parents of the child or the child to ensure the safe return of the child to the child's home." R.C. 2151.413(D)(3)(b).

{¶ 31} Here, the juvenile court made multiple determinations that the agency had engaged in reasonable efforts at reunification during the pendency of the case. (*See* Apr. 12, 2019 Findings of Fact & Conclusions of Law (citing B.G.'s refusal of services offered when

determining FCCS had "made reasonable efforts to prevent the continued removal" of A.G.); July 28, 2020 Jgmt. Entry (finding that "[r]easonable efforts [had] been made to finalize the permanency plan in effect for the child" when granting motion to extend temporary custody under R.C. 2151.415(D)(1)); Sept. 29, 2020 Findings of Fact & Conclusions of Law (concluding that FCCS had "made reasonable efforts to finalize permanency planning" for A.G when conducting placement review under R.C. 2151.417).) In addition, when adjudicating A.G. a dependent child, the magistrate determined that "reasonable efforts [had] been made to prevent or eliminate the need for removal of [A.G.] from the child's own home." (Aug. 26, 2019 Mag.'s Decision at 1.)  B.G. did not appeal from the juvenile court's judgment adopting the dependency adjudication with this finding, which was a final appealable order.  *In re Murray*, 52 Ohio St.3d 155 (1990), syllabus (holding that "[a]n adjudication by a juvenile court that a child is * * * 'dependent' as defined in R.C. Chapter 2151 followed by a disposition awarding temporary custody to a public children services agency pursuant to R.C. 2151.353 (A)(2) constitutes a 'final order' * * * and is appealable to the court of appeals").  Because the juvenile court complied with its duty under R.C. 2151.419 to make reasonable efforts determinations at successive dispositional proceedings as this case progressed, R.C. 2151.413(D)(3)(b) did not prohibit FCCS from filing the motion for permanent custody.

{¶ 32}  We also emphasize that B.G.'s assertion that "R.C. 2151.419(A)(1) references instances where reasonable efforts must be demonstrated, including permanent custody hearings per R.C. 2151.353(A)(4)," is incorrect.  (Brief of Appellant at 47.)  While R.C. 2151.419(A)(1) does enumerate the proceedings in which a juvenile court must make a reasonable efforts determination, the provision does not include or "reference" permanent custody proceedings, which are governed by R.C. 2151.413 and 2151.414:

> Except as provided in division (A)(2) of this section, at any hearing held pursuant to section 2151.28, division (E) of section 2151.31, or section 2151.314, 2151.33, or 2151.353 of the Revised Code at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency or private child placing agency that filed the complaint in the case, removed the child from home, has custody of the child, or will be given custody of the child has

> made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home.

R.C. 2151.419(A)(1).

{¶ 33} The sections listed in R.C. 2151.419(A)(1) "involve adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children, all of which occur prior to a decision transferring permanent custody to the state." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 41. "Because this statute makes no reference to a hearing on a permanent custody motion, it does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414." *In re A.P.*, 10th Dist. No. 23AP-253, 2024-Ohio-741, ¶ 58. The Supreme Court of Ohio has stated unequivocally that "R.C. 2151.419(A)(1) does not apply in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413." *In re C.F.* at ¶ 43. The court recognizes only the following exception: "If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* This exception does not apply here because, as discussed, the juvenile court addressed the reasonable efforts on multiple occasions before FCCS filed the motion for permanent custody.

{¶ 34} Among the five types of hearings listed where a juvenile court must make a reasonable efforts determination, R.C. 2151.419(A)(1) identifies R.C. 2151.353, an adjudication of a child as abused, neglected, or dependent. The latter statute lists six types of dispositional orders that "the court may make" after adjudicating a child as abused, neglected, or dependent. R.C. 2151.353. One of the six, as stated in R.C. 2151.353(A)(4), is a permanent custody determination under R.C. 2151.414. This reference to a permanent custody proceeding has no relevance to a reasonable efforts determination. Because R.C. 2151.419(A)(1) does not include any subsection of R.C. 2151.353,one cannot be shoehorned into the reasonable efforts statute without contradicting its text and the holding of *In re C.F.*

{¶ 35} B.G. also asserts that the juvenile court failed to "make a determination that the agency is not required to make reasonable efforts" at reunification, as required by R.C. 2151.419(A)(2), when the parent has abandoned the child under R.C. 2151.419(A)(2)(d). Because the juvenile court discussed reasonable efforts at length in its decision, but did not expressly determine that they were not required, B.G. believes that "FCCS was not relieved of its burden of establishing reasonable efforts." (Brief of Appellant at 49.) In other words, her position is that the court's failure to state that no reasonable efforts determination was required actually created an obligation for FCCS to prove them again at the permanent custody hearing.

{¶ 36} This argument invokes R.C. 2151.419(A)(2), which provides that if one of a series of enumerated conditions apply, "the court shall make a determination that the agency is not required to make reasonable efforts to prevent the removal of the child from the child's home, eliminate the continued removal of the child from the child's home, and return the child to the child's home * * * ." Relevant here is the condition under R.C. 2151.419(A)(2)(d), when "[t]he parent from whom the child was removed has abandoned the child." The juvenile court found that B.G. abandoned A.G. (Dec. 30, 2022 Decision & Jgmt. Entry at 13-14.)

{¶ 37} An obligation that a children services agency again prove reasonable efforts at the permanent custody hearing does not independently arise because a juvenile court fails to "make [the] determination that the agency is not required to make reasonable efforts" required by R.C. 2151.419(A)(2). Such an obligation would exist if the statutory text stated that "the court shall make a determination *whether* the agency is not required to make reasonable efforts to prevent the removal of the child from the child's home," for example, and the juvenile court then stated that the agency was required to again prove reasonable efforts. But such language only appears in R.C. 2151.419(A)(1), and that provision, as explained, does not apply. *See* R.C. 2151.419(A)(1) (stating "the court shall determine whether the public children services agency * * * has made reasonable efforts"). In this case, the juvenile court addressed reasonable efforts at length, but did not state that no such determination was required, in spite of the mandatory language of R.C. 2151.419(A)(2) that it say so. For the sake of clarity, it should have made this statement.

Its reasonable efforts discussion was undoubtedly a well-intentioned attempt at thoroughness, and the omission of the language required by R.C. 2151.419(A)(2) created confusion about what law guided its discussion. However, the omission cannot be interpreted as creating an obligation that does not otherwise appear in R.C. 2151.419(A)(2).

{¶ 38} This situation occurred in *In re A.P.*, 10th Dist. No. 23AP-253, 2024-Ohio-741, in which we affirmed the juvenile court's judgment terminating a mother's parental rights under R.C. 2151.414. On appeal, she argued that FCCS had "failed to make reasonable and diligent efforts to reunify the family," as required by R.C. 2151.419(A)(1). *In re A.P* at ¶ 57. However, the exception under R.C. 2151.419(A)(2)(e) applied because her parental rights of the child's siblings had been previously involuntarily terminated. *Id.* at ¶ 60. "Thus, the trial court was not required to make a finding, in the context of this [Permanent Custody Commitment] proceeding, that FCCS had exercised reasonable efforts to return" the child to her. *Id.* at ¶ 61. In that case, as here, the juvenile court "nevertheless made extensive findings regarding the efforts made by FCCS to reunite" them, although it was not required to. *Id.* at ¶ 62.

{¶ 39} Even if the juvenile court were required to make the reasonable efforts determination, B.G.'s arguments alleging that it erred are unpersuasive. First, she argues that FCCS failed to engage in reasonable efforts at reunification because the agency "did not use intensive efforts to identify and engage an appropriate and willing kinship caregiver pursuant to R.C. 2151.4117." (Brief of Appellant at 51-52.) However, "a public children services agency has no statutory duty to make 'reasonable efforts' to place the child with an extended family member before it can obtain permanent custody of the child." *In re M.O.*, 4th Dist. No. 10CA3189, 2011-Ohio-2011, ¶ 16. *See also In re Warren*, 5th Dist. No. 2007CA00054, 2007-Ohio-5703, ¶ 23, (stating that the "duty to use reasonable efforts applies only to efforts to avoid removal of a child from her home or to reunify the child with her family, following removal," as there is "no statutory duty to make reasonable efforts to place a child with relatives although relative placement is to be investigated").

{¶ 40} In addition, the assertion that FCCS "failed to arrange video visitations" until September 2020, even though it had obtained temporary custody of A.G. in April of the year before, is inconsistent with the record. (Brief of Appellant at 52.) Ms. Ramsey, the

caseworker from April 2019 until 2021, testified that she made repeated attempts to see "what day and time worked" for B.G. for video visits. (Nov. 7, 2022 Tr. at 52.) But "the day and times ended up changing because for whatever reason, [B.G.] wasn't participating in them or she would forget about them or the time didn't work." *Id.* Although the juvenile court did not have to engage in a determination of FCCS's reasonable efforts at reunification, if it had been required to do so, its final assessment of their adequacy would not have been erroneous. The second assignment of error is overruled.

## IV. Third Assignment of Error

{¶ 41} In the third assignment of error, B.G. argues that the juvenile court erred when it failed to comply with 25 C.F.R. 23.107(a), the implementing regulation of ICWA, which requires a juvenile court to ask each participant at the permanent custody hearing about the possible Native American heritage of the child. (Brief of Appellant at 52-53.) The only ICWA inquiry in the record occurred at the April 12, 2019 temporary custody hearing, she asserts, but never thereafter. *Id.* at 54. Based on our holding in *In re D.E.*, 10th Dist. No. 20AP-83, 2021-Ohio-524, B.G. argues that remand for the juvenile court to conduct the inquiry is required. *Id.* at 55.

{¶ 42} In order to address the "alarmingly high percentage of Indian families [that] are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies" and remedy the placement of an "alarmingly high percentage of such children * * * in non-Indian foster and adoptive homes," Congress passed ICWA in 1978. 25 U.S.C. 1901(4). ICWA "aims to keep Indian children connected to Indian families." *Haaland v. Brackeen*, 599 U.S. 255, 143 S.Ct. 1609, 1623 (2023). To accomplish this goal, ICWA requires that "[i]n any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe" if the tribe or parents so request. 25 U.S.C. 1911(b). 25 C.F.R. 23.107(a) provides a procedure for state courts to determine whether ICWA applies:

> State courts must ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an

> Indian child. The inquiry is made at the commencement of the proceeding and all responses should be on the record. State courts must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.

{¶ 43} Once the state court "knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe * * * of the pending proceedings and of their right of intervention." 25 U.S.C. 1912(a).

{¶ 44} We have previously emphasized that "[t]he importance of a proper ICWA inquiry cannot be overstated" because the failure to comply with its notice provisions may result in invalidation of the juvenile court's custody determination under 25 U.S.C. 1914. *In re D.E.* at ¶ 61. *See also* Adm.Code 5101:2-53-02(A) ("Failure to identify Indian children can nullify court proceedings that have not been conducted in accordance with ICWA."). "The collateral consequences of not making a proper inquiry are potentially severe and could cause significant disruption for children and families affected by the same beyond termination of a permanent custody case." *In re D.E.* at ¶ 61.

{¶ 45} In *In re D.E.*, the mother was asked about potential Native American background at the temporary custody hearing and she indicated that she had Cherokee heritage, but she later answered the question in the negative at the permanent custody hearing. *Id.* at ¶ 56-59. The attorney for FCCS briefly addressed the issue, but the juvenile court failed to ask any other participant if they knew or had reason to know the child was an Indian child. *Id.* at ¶ 59. We noted that "it is not possible to determine whether ICWA applies or does not apply if the proper inquiry pursuant to 25 C.F.R. 23.107 is not made." *Id.* at ¶ 60.

> Without proper inquiry, pursuant to 25 C.F.R. 23.107, the juvenile court cannot determine if it knows or has reason to know if the children are Indian children as defined in 25 U.S.C. 1903. Without making such "knows or has reason to know" determination, the juvenile court cannot determine if the notice of right of intervention to relevant tribe(s) applies. 25 U.S.C. 1912(a).

*Id.* at ¶ 67.

{¶ 46} Accordingly, we remanded the case to the juvenile court for it to "promptly" conduct the inquiry required by 25 C.F.R. 107. *Id.* at ¶ 68. *See also In re R.G.*, 8th Dist. No. 104434, 2016-Ohio-7897, ¶ 18 (reversing and remanding for the juvenile court to conduct the ICWA inquiry where "[t]hroughout the pendency of the case the trial court had ample opportunities to address the applicability of the ICWA * * * but such inquiry was never made").[2]

{¶ 47} Other than the magistrate's sole question directed at B.G. at the temporary custody hearing, there is no indication in the record that the juvenile court made any inquiry of any participant in any proceeding that 25 C.F.R. 107 requires. (Apr. 12, 2019 Tr. at 4.) Because the juvenile court must comply with the regulation, we sustain the third assignment of error and remand this case to the juvenile court for it to conduct the ICWA inquiry in accordance with the procedure stated in 25 C.F.R. 107.

## V. First Assignment of Error

{¶ 48} In the first assignment of error, B.G. challenges the juvenile court's decision to grant the motion for permanent custody. She argues that the decision was based on insufficient evidence and was against the manifest weight of the evidence. As in *In re D.E.,* however, because this case must be remanded for the juvenile court to comply with its obligation under 23 C.F.R. 107, we decline to reach these issues until the inquiry is complete. *In re D.E.* at ¶ 93 (holding that because of the necessary remand "for the juvenile court to make a proper ICWA inquiry, it is premature to address appellant's arguments regarding the weight of the evidence" and overruling assignment of error as moot), citing *Columbus v. Phillips*, 10th Dist. No. 15AP-408, 2015-Ohio-5088, ¶ 46, and *In re Kangas*, 11th Dist. No. 2006-A-0010, 2006-Ohio-3433, ¶ 56 (stating that "[i]t is premature to address an argument regarding the weight of the evidence when additional evidence may be presented to the trial court on remand"). Accordingly, the first assignment of error is overruled as "premature and moot." *In re D.E.* at ¶ 94.

---

[2] 25 C.F.R. 107 was not effective until December 12, 2016, after the permanent custody hearing in *In re R.G* was held. 81 Fed.Reg. 38778; *In re R.G.*, 8th Dist. No. 104434, 2016-Ohio-7897 at ¶ 12 (stating that "the time of trial [was] April 2016"). It is notable that even without the guidance of the specific procedure the regulation provides, the Eighth District Court of Appeals recognized the importance of conducting an ICWA inquiry based solely on the notice and transfer of jurisdiction provisions under 25 U.S.C. 1911 and 1912. *See In re R.G.* at ¶ 15-18.

## VI. Conclusion

{¶ 49} Having sustained the third assignment of error, overruled the second assignment of error, and overruled the first assignment of error as premature and moot, we reverse the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, and remand this cause for further proceedings consistent with this decision.

*Judgment reversed*;
*cause remanded with instructions.*

BEATTY BLUNT and LELAND, JJ., concur.

———————————