[Cite as *In re A.R.B.*, 2024-Ohio-4830.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| A.R.B., et al. | : | CASE NO. CA2024-04-057 |
| | | CA2024-04-058 |
| | : | CA2024-04-059 |
| | | CA2024-05-066 |
| | : | |
| | | O P I N I O N |
| | : | 10/7/2024 |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2022-0024; JN2022-0025; JN2022-0087

Fred S. Miller, for mother.

Mark W. Raines, for grandmother.

Garrett Law Offices, and Dawn S. Garrett, for children.

CASA, and Sarah A. Owens, guardian ad litem.

Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant
Prosecuting Attorney, for appellee.

**M. POWELL, J.**

{¶ 1} Kayla Brown ("Mother") and Christy Brown ("Grandmother") appeal the

decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of seven-year-old Alice, five-year-old Beth, and four-year-old Charles (collectively, the "children") to the Butler County Department of Jobs and Family Services ("the Agency").[1] For the reasons outlined below, we affirm the juvenile court's decision.

{¶ 2} At first glance, the facts of this case are bewildering. They involve the three children subject to these proceedings, other children not subject to these proceedings, criminal proceedings, and the lurid relationships between multiple generations of family members. However, many of the underlying facts are not contested in any significant way or are clearly established in the record.

{¶ 3} The Agency filed complaints regarding Alice and Beth on January 27, 2022. Alice and Beth had been in Grandmother's legal custody since 2019 after prior custody proceedings removed them from Mother's care. The complaints alleged that Alice and Beth were dependent children because Jesse Black, Grandmother's paramour, was arrested for domestic violence involving Grandmother and because Black used cocaine with and later assaulted one of his and Grandmother's children.

{¶ 4} The complaints further stated that Alice and Beth were confirmed via paternity tests to be Black's children. That is, Black engaged in a sexual relationship with Mother, who is Grandmother's daughter. Mother was a minor when she gave birth to Alice and Beth, and because of this, Black was later convicted of two counts of gross sexual imposition and one count of unlawful sexual conduct with a minor. Black was incarcerated during the custody proceedings below and remains incarcerated.

{¶ 5} The Agency also filed a complaint regarding Charles on March 22, 2022

---

1. Alice, Beth, and Charles are pseudonyms adopted for this opinion for the purposes of privacy and readability. *In re D.P.*, 2022-Ohio-4553, ¶ 1, fn. 1 (12th Dist.).

after Mother was arrested for domestic violence against a sibling in Grandmother's home while Charles was present. Charles was in Mother's custody, and it was alleged Mother could not provide stable housing or support for him. Charles was also confirmed to be Black's biological child.

{¶ 6} The court granted temporary custody of Alice, Beth, and Charles to the Agency in September 2022. In July 2023, the Agency moved for permanent custody of the children, and after conducting a hearing, the magistrate granted the Agency's motion. Mother and Grandmother filed objections to the magistrate's decision, but the trial court overruled the objections and adopted the opinion of the magistrate.

{¶ 7} Further facts will be discussed below.

{¶ 8} On appeal, Mother and Grandmother generally raise two similar assignments of error.

{¶ 9} MOTHER'S FIRST ASSIGNMENT OF ERROR AND GRANDMOTHER'S SECOND ASSIGNMENT OF ERROR:

{¶ 10} THE TRIAL COURT ERRED TO THE PREJUDICE OF MOTHER WHEN IT DID NOT INQUIRE OF EACH PARTICIPANT IN THE CASE WHETHER HE OR SHE KNEW OR HAD REASON TO KNOW WHETHER EACH CHILD IS AN INDIAN CHILD.

{¶ 11} THE TRIAL COURT FAILED TO COMPLY WITH THE INDIAN CHILD WELFARE ACT BEFORE ISSUING ITS DECISION GRANTING PERMANENT CUSTODY.

{¶ 12} First, both Mother and Grandmother argue the trial court should be reversed because it failed to comply with the requirements of the Indian Child Welfare Act (the "Act") as found in 25 U.S.C. 1911.

{¶ 13} The parties agree that three separate inquiries were made regarding

whether the children have Indian heritage. Two occurred at ex parte hearings with neither Mother nor Grandmother present on March 22, 2022 and August 25, 2022. At each, the magistrate asked if there was any possibility that Charles is an Indian child, and the caseworker responded there was not at each hearing. At the March 22 hearing, the magistrate also asked, and the Agency confirmed, that the Agency had inquired as to whether Charles is an Indian child. The magistrate's entries after each hearing stated the Act was complied with and that Charles was not an Indian child.

{¶ 14} On March 30, 2022, both Mother and Grandmother were present for a shelter care hearing when the magistrate asked "does anybody have any reason to believe that [Charles] is a member of a Native American Tribe, an Indian Tribe or is eligible for membership in an Indian Tribe or if either of [Charles's] parents is a member of an American Tribe or is eligible for membership?" After the Agency replied no, the magistrate stated, "No, okay, alright. I think that clears up what federal laws are involved right now." The magistrate's entry after this hearing also stated the Act was complied with and that Charles was not an Indian child.

{¶ 15} The Act is a federal law that requires state courts to inquire of "each participant in an emergency or voluntary or involuntary child-custody proceeding" whether there is any reason to believe the children involved are a member of or eligible for membership in an Indian tribe. 25 C.F.R. 23.107(a) and 23.2. If there is, various procedural requirements exist within the Act which "aim[ ] to keep Indian children connected to Indian families." *Haaland v. Brackeen*, 599 U.S. 255, 255 (2023). Failure by Ohio courts "to identify Indian children can nullify court proceedings that have not been conducted in accordance with [the Act]." Adm.Code 5101:2-53-02.

{¶ 16} We note at the onset that because Grandmother and Mother did not raise

issues regarding the Act at the trial level, they have forfeited all but plain error. *Doran v. Doran*, 2009-Ohio-5521, ¶ 15 (12th Dist.). A party asserting plain error must show an obvious error by the trial court that affects that party's "substantial rights." *State v. Rogers*, 2015-Ohio-2459, ¶ 22. Stated differently, plain errors "'must have affected the outcome of the trial.'" *Id.*, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002); *see also State v. Biros,* 78 Ohio St.3d 426 (1997) ("Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise.").

{¶ 17} Notably, the plain error doctrine has its origins with criminal law, and the Supreme Court of Ohio has stressed that the doctrine should only be applied in civil appeals "in *the extremely rare* case involving *exceptional* circumstances where [the] error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." (Emphasis added). *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121-123 (1997).

{¶ 18} The Supreme Court's reasoning behind this "very high standard" was that parties in civil cases "bear responsibility for framing the issues and for putting both the trial court and their opponents on notice of the issues they deem appropriate for . . . resolution." *Perez v. Falls Financial, Inc.*, 87 Ohio St.3d 371, 375 (2000); *id.* at 122. As a result, "the plain error doctrine should never be applied to reverse a civil judgment to allow litigation of issues which could easily have been raised and determined in the initial trial." *Goldfuss* at 122. Permanent custody disputes are civil cases subject to this standard. *In re J.M.*, 2019-Ohio-3716, ¶ 14 (12th Dist.); *In re A.D.*, 2022-Ohio-736, ¶ 17 (12th Dist.).

{¶ 19} It is not difficult to conclude that the magistrate failed to properly inquire

whether the Act applied to this case. Neither Mother nor Grandmother, nor even the children's legal representatives, were present at the two ex parte hearings for the magistrate to inquire of them whether there was any reason to believe that the children are members of or eligible for membership in an Indian tribe. Additionally, while Mother and Grandmother were present at the shelter care hearing on March 30, 2022, the magistrate's inquiry was not directed at them, and only the Agency answered the question. We need not parse 25 C.F.R. 23.107 and its procedural requirements in any great detail to conclude the magistrate's inquiries were facially insufficient.

{¶ 20} Nonetheless, we fail to see plain error in this case. Upon review, the record below contains no indication the children are of Indian heritage, are members of a tribe, or eligible for tribe membership. In fact, the record indicates the contrary based upon the magistrate's questioning of the caseworker and prosecutor, including at the March 30 hearing where Mother and Grandmother were present and did not speak on the issue.[2] These inquiries and the magistrate's subsequent orders stating it had complied with the Act were sufficient to, at the very least, put Grandmother and Mother on notice of the issue. Had they wanted to, Grandmother and Mother each had the opportunity to notify the court of any alleged deficiencies pertaining to the Act via objections to the magistrate's decision. They did not do so.

{¶ 21} Mother and Grandmother are correct that the Act puts responsibility on the trial court and its magistrates to first make proper inquiries as to the applicability of the Act before any party asserting it does apply bears the burden of proving so. The magistrate's single, fleeting inquiry, in the presence of Mother and Grandmother and its

---

2. We acknowledge that these inquiries related only to Charles and not to Alice or Beth. However, because Alice and Beth share common parentage with Charles, the indication in the record that Charles is not of Indian heritage would also apply to Alice and Beth.

orders stating compliance with the Act were insufficient in that regard. Based on the record before us, however, we cannot say that but for this error the Act would have been found to apply. This issue could have easily been raised and litigated by Grandmother and Mother after they were put on notice of the issue multiple times. We therefore conclude the error by the magistrate does not amount to a plain error that seriously affects the legitimacy of the underlying proceedings.[3]

{¶ 22} Mother's first and Grandmother's second assignments of error are overruled.

{¶ 23} MOTHER'S SECOND ASSIGNMENT OF ERROR AND GRANDMOTHER'S FIRST ASSIGNMENT OF ERROR:

{¶ 24} THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT WHEN IT GRANTED PERMANENT CUSTODY TO [THE AGENCY] WITHOUT MAKING A DETERMINATION THAT THE CHILDREN WERE ADOPTABLE.

{¶ 25} THE TRIAL COURT'S DECISION TO GRANT [THE AGENCY] PERMANENT CUSTODY IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

{¶ 26} Mother and Grandmother argue the trial court erred in granting permanent custody of Alice, Beth, and Charles to the Agency. Notably, Mother does not argue that custody should have been granted to her but instead to Grandmother. As a result, our analysis will focus on Grandmother.

{¶ 27} Both Grandmother and Mother assert the trial court placed too much

---

3. Mother cites to a Tenth District case to argue that failure to properly inquire as to the applicability of the Act is plain error. *Matter of A.G.*, 2024-Ohio-2136 (10th Dist.). However, as recognized by Mother, the Tenth District does not squarely address whether insufficient inquiries by the trial court are plain error. Indeed, the opinion never mentions plain error. *See id.* The court, having concluded simply the trial court did not properly inquire as to the applicability of the Act, found it could not make any determination as to whether the court properly applied the Act. *Id.* at ¶ 45-46.

emphasis on what they characterize as their prior relationship with Black. They state Grandmother has ceased contact with Black, making the trial court's concern about him coming back into the children's lives merely speculative. In addition, Grandmother points to the progress she made to improve her and the children's lives during these proceedings. The Agency, in turn, argues that granting Grandmother custody of the children is a "gamble" due to her relationship with Black.

{¶ 28} It is not contested that all three children have a strong bond with Grandmother. The magistrate found that contact between them all was "reasonably consistent" during the proceedings despite the fact that Grandmother remained at a higher level of supervision during their visits. Moreover, though the children were placed in the care of multiple foster families, no potential adoptive placement for them has been identified. The children expressed (either by themselves or through their attorney) that they desire to return to Grandmother's care.

{¶ 29} Despite these considerations, various areas of concern arose during the underlying proceedings. For example, while Grandmother reported employment with Uber and Amazon, she struggled to maintain stable housing as she moved in between apartments, hotel rooms, and even the house of Black's mother. Grandmother also participated in recommended case plan services, including domestic abuse counseling. While these sessions went "smoothly" according to her counselor, Grandmother was found to have lied to her counselor about her ongoing relationship with Black.

{¶ 30} In addition, Alice and Beth were regularly absent from preschool. In a single academic year, Alice had 42 absences and Beth had 23 absences. Some absences were "medically documented" while others were not. Both Alice and Beth have individual education plans ("IEPs") and received speech therapy at school. Charles was also

assessed for and deemed in need of an IEP in late 2023. Grandmother testified she worked with the children on their speech needs and expressed frustration the children did not receive more help through school and the Agency.

{¶ 31} Up to and during these proceedings, Grandmother and Black had a 17-year on-and-off-again relationship. Despite being in a relationship with Grandmother, Mother testified that Black told Mother he, "dreamed [of] having sex with [Mother] when he changed [her] diapers when [she] was two years old." As mentioned above, Black was convicted of sex offenses involving Mother and was determined to be the father of the children, two of which were born while Mother was a minor.

{¶ 32} Nonetheless, Grandmother acknowledged an ongoing relationship with Black despite him being incarcerated for crimes against Mother and previously reporting him for domestic violence. In fact, both Mother and Grandmother participated in dozens of jail phone calls with Black, many of which were explicitly sexual in nature. Grandmother repeatedly put money in Black's accounts, told him that she loved him, and talked about how life would be when he was released. Grandmother testified she was pretending to maintain a relationship with Black at the advice of the Women's Helping Women abuse center. However, Grandmother presented no proof she was working with the center.

{¶ 33} Grandmother adamantly asserted she stopped contacting Black after he was transferred from the Butler County Jail to state prison in July 2023. Yet, Grandmother also acknowledged during her testimony that she still contacted and sometimes received rides to court from Black's mother despite the fact that Black and his mother spoke regularly.

{¶ 34} Grandmother has custody of two teenage sons not subject to these proceedings. They were found to have been truant from school while in Grandmother's

custody and have a history of substance abuse. Grandmother admitted to letting these children speak to Black by phone in violation of court orders. Troublingly, the Agency also investigated allegations that one of these teenagers sexually abused Alice. Grandmother and Mother denied these allegations. No charges were filed, but the magistrate concluded "there is reason to believe (not clear and convincing evidence) that the alleged sexual abuse occurred."

{¶ 35} The magistrate's January 9, 2024 decision found it was in the best interest of the children to grant permanent custody to the Agency. In part, the trial court concluded "Protecting these children from contact with Jesse Black has, understandably, been the focus of this case from the beginning . . . Given the content of the communication between mother, grandmother, and Mr. Black, Mr. Black's focus on sex appears to be quite pathologic and, in terms of having children in his care, dangerous."

{¶ 36} Under R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re K.P.*, 2022-Ohio-1347, ¶ 17 (12th Dist.). First, R.C. 2151.414(B)(1) provides that the juvenile court must find that the grant of permanent custody to the agency is in the "best interest" of the child. *In re M.H.*, 2022-Ohio-48, ¶ 35 (12th Dist.).

{¶ 37} To determine a child's best interest in a permanent custody hearing, a juvenile court must consider all relevant factors, including, but not limited to (1) the child's relationship with his or her parents, family, foster parents, and other caregivers, (2) the wishes of the child, (3) the child's custodial history, (4) "the child's need for a legally secure placement," and (5) "[a]ny other factor the court considers relevant." R.C. 2151.414. A critical consideration weighed by the trial court is whether an individual advocating for

custody has "'substantially remedied the concerns that caused the [children's] removal from . . . [their] custody.'" *In re K.G.*, 2021-Ohio-2154, ¶ 23 (12th Dist.), quoting *In re S.M.*, 2015-Ohio-2318, ¶ 24 (12th Dist.). Additionally, the Agency does not have "to prove that adoption is likely" to make permanent custody in the best interest of the children. *In re C.W.*, 2020-Ohio-1248, ¶ 76 (10th Dist.).

**{¶ 38}** After considering the best interest of the children, the juvenile court must also find that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) apply. *In re R.B.*, 2022-Ohio-1705, ¶ 31 (12th Dist.). One of those circumstances is that a child has been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period. *Id.* It is not contested on appeal that the children have been in the Agency's custody for 12 or more months of a 22-month period.

**{¶ 39}** "An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re A.S.*, 2019-Ohio-4127, ¶ 19 (12th Dist.). However, "[e]ven if there is sufficient evidence to support the juvenile court's decision, an appellate court may nevertheless reverse a permanent custody judgment if it finds the judgment to be against the manifest weight of the evidence." *In re G.A.*, 2023-Ohio-643, ¶ 18 (12th Dist.), citing *In re F.S.*, 2021-Ohio-345, ¶ 61 (12th Dist.).

**{¶ 40}** To determine whether a juvenile court's judgment is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re*

*S.M.*, 2019-Ohio-198, ¶ 16 (12th Dist.), quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. "The presumption in weighing the evidence favors the finder of fact, which we are especially mindful of in custody cases." *In re R.K.*, 2021-Ohio-3074, ¶ 15 (12th Dist.). Stated differently, appellate courts must defer to the findings and judgment of the trier of fact if the evidence is susceptible to more than one construction. *In re D.S.*, 2022-Ohio-998, ¶ 63 (12th Dist.).

{¶ 41} The juvenile court properly concluded that it was in the best interest of the children to grant permanent custody to the Agency. The first two factors cited above favor Grandmother. The children have a good relationship with Grandmother, and they have expressed, by themselves or through representation, they wish to return to her care.

{¶ 42} Nonetheless, the record is replete with other evidence of strife and disfunction within Grandmother's family. This includes instances of domestic violence among Black, Grandmother, Mother, or other family members, drug abuse by Black and Grandmother's other children, and unstable housing. Furthermore, despite their educational and therapeutic needs, Alice and Beth were regularly absent from school while in Grandmother's care. Similarly, Grandmother's teenage sons are often truant. These facts are concerning as Charles approaches school age and also needs special attention.

{¶ 43} Obviously more concerning, however, is the family's history of interwoven sexual relationships and abuse. It is simply inescapable Black had long term, sexual relationships with Grandmother and Mother both before and while being incarcerated for said relationship with Mother. It is beyond comprehension why Grandmother would continue to financially support as well as state her love and desire for a man who repeatedly sexually abused her daughter. Clearly, the trial court did not believe

Grandmother's argument such actions were at the advice of a domestic abuse center, and nothing in the record remotely suggests that we should not defer to, if not concur with, the judgment of the trial court in this regard. Grandmother's behavior is particularly troubling as she seeks custody of two young girls who are in a vulnerable position similar to that in which Black preyed upon Mother.

{¶ 44} We also note with great concern that this history of abuse continues to cast a direct cloud over this family in the form of hefty allegations (albeit unproven) that one of Grandmother's sons sexually abused Alice.

{¶ 45} While Grandmother adamantly states she has not been in contact with Black since he was sent to prison, that demonstrates little because her relationship with Black has been a tumultuous on and off again relationship that spans 17 years. In addition, Grandmother has maintained contact with and sometimes relies on Black's mother despite knowing that Black regularly speaks with his mother. Ultimately, we see no error in the trial court's conclusion that Grandmother's lack of contact with Black since he was transferred to state prison is simply insufficient to substantially remedy the concern that when released from prison, Black will be welcomed back in some capacity by Grandmother.

{¶ 46} In conclusion, despite the children's wishes for reunification, their bond with Grandmother, and the fact no adoptive placement has been identified, the record before us demonstrates the children are unsafe in Grandmother's custody and that it is not in their best interest to return to her care for a variety of reasons. The Agency argues primarily it is a "gamble" to return custody of the children to Grandmother because of the threat Black represents when released. Instead, we conclude it reasonable to expect, as the trial court did, that because of Grandmother's actions, Black will continue to represent

a danger to the children, particularly Alice and Beth.

**{¶ 47}** Judgment affirmed.

BYRNE, P.J., and PIPER, J., concur.